BLUEBERRY LAND COMPANY, Inc. and Richmond Hill Land Company, Inc., Petitioners,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

No. 22319.

United States Court of Appeals Fifth Circuit.

May 16, 1966.

D. H. Markstein, Jr., Birmingham, Ala., for petitioners.

Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, Atty., Dept. of Justice, Mitchell Rogovin, Chief Counsel, I. R. S., Aaron D. Trub, Atty., I. R. S., Johnathan S. Cohen, David O. Walter, Attys., Dept. of Justice, Washington, D. C., John B. Jones, Jr., Acting Asst. Atty. Gen., for respondent.

Before BROWN and COLEMAN, Circuit Judges, and GARZA, District Judge.

JOHN R. BROWN, Circuit Judge:

The corporate Taxpayers appeal an adverse judgment after trial in the Tax Court.[1] The tax problem arises out of the disposition of certain installment obligations to First Federal.[2] Ostensibly the disposition was made by an intermediate corporation, which had first purchased all of Taxpayers' stock, and then liquidated Taxpayers to obtain their assets. In substance, says the Government, the disposition was in fact a sale by the corporate Taxpayers, thus subjecting them to tax on the gain arising therefrom under Int. Rev. Code of 1954 § 453(d), 26 U.S.C.A. § 453(d). Once again this poses the question: is the form or the substance of the transaction controlling for purposes of the Federal income tax. We hold, in agreement with the Tax Court, that for tax purposes this transaction was but a sham of form and must give way to the substance, so that Taxpayers in fact sold the installment obligations, received the gain therefrom, and are taxable thereon.

The facts upon which this case arose, while not difficult of comprehension or in material dispute, are nevertheless rather detailed and complex. From the Tax Court's very thorough presentation, the following may be distilled. Blueberry Land Company and Richmond Hill Land Company, Taxpayers, are Georgia corporations organized in 1956 to engage in the real estate development business. From their inception the stock of the two corporations was owned by Marc Levine, Harold Levin, and David W. Cohen,[3] all three of whom were directors and officers of the corporations.

Upon their incorporation Taxpayers acquired several tracts of land in and around Bryan County, Georgia. As part of their operations, Taxpayers subdivided and developed the properties, and sold houses and individual lots. The terms of the sales included very small down payments coupled with the purchaser's execution of a mortgage[4] securing the balance of the purchase price, which was payable in monthly installments. Taxpayers sold most of the houses and lots in their respective subdivisions and, by the end of 1958, held approximately 103 installment obligations, secured by mortgages on the realty previously sold by them.

Taxpayers elected to report these sales on the installment method under Int. Rev. Code of 1954 Section 453(b), 26 U.S.C.A. § 453(b). During the period here involved Taxpayers had substantial unrealized profits represented by the unpaid portions of the various installment obligations. These unrealized profits would be ordinary income when realized to Taxpayers.[5]

Sometime prior to May 1959, Taxpayers' officers became interested in disposing of the mortgages and installment obligations (collectively referred to as "mortgages"). Representatives of Taxpayers met to discuss this possibility

1. 1964, 42 T.C. 1137.

2. First Federal Savings and Loan Association of Savannah, Georgia.

3. The stock ownership in the corporations was as follows:

| | Number of Shares | |
| --- | --- | --- |
| | Blueberry | Richmond |
| Levine | 75 | 200 |
| Levin | 15 | 40 |
| Cohen | 60 | 160 |

4. We will refer to these security instruments as "mortgages," although in Georgia they are technically known as "deeds to secure debt."

5. There is no question that Taxpayers were engaged in developing and selling real estate, and thus held the properties "primarily for sale to customers in the ordinary course of their business." See Int. Rev.Code of 1954 § 1221, 26 U.S.C.A. § 1221; 3B Mertens, Law of Fed. Income Taxation § 22.15 (1958) [hereinafter cited as Mertens]. See also Malat v. Riddell, 1966, 383 U.S. 569, 86 S.Ct. 1030, 16 L.Ed.2d 102 [Mar. 21, 1966].

with John Jursich, of Syndicate.[6] Syndicate, through Jursich, was to act as a broker in facilitating the sale of the mortgages. It did not intend to purchase the mortgages for its own interest. Syndicate thereupon contacted First Federal regarding a sale of the mortgages. On May 20, 1959, Taxpayers and Syndicate executed a "Memorandum of Agreement" specifying the terms and conditions under which the disposition of the mortgages was to be consummated.[7] While this agreement reveals that a sale of the mortgages was the primary goal, it also reveals that the parties desired to minimize the tax consequences attendant to this disposition.[8] On May 22, First Federal agreed with Syndicate to purchase the mortgages on the terms and conditions contained in the May 20 Memorandum.

In June, First Federal investigated Syndicate and discovered that its credit position was somewhat precarious. This was important in view of Syndicate's obligation to make the security deposits (see para. 2(a), note 7, supra). However negotiations to purchase the mortgages continued, with Taxpayers' stockholder Cohen assuming an aggressive role.

First Federal then undertook an investigation of the commercial value of the mortgages, and advised Cohen of the

---

6. Mortgage Investment Syndicate, Inc., of Chicago.

7. "Whereas, the Companies [Blueberry and Richmond] are the owners of approximately 103 individual mortgages as shown on Schedule A attached hereto and made a part of this agreement, and

"Whereas, said Companies are desirous of selling said mortgages, and

"Whereas, the Syndicate has procured a purchaser of said mortgages, therefore, it is agreed for and in consideration of the mutual promises, covenants and agreements by the parties hereto, to-wit:

"1. Companies will sell the mortgages referred to in Schedule A attached hereto a purchaser procured by the Syndicate on the following terms and conditions:

"(a) Companies agree to sell said mortgages at a discount of fifteen (15%) percent of the principal unpaid balance of said mortgages at the time the sale is consummated and the mortgages transferred and assigned.

"2. (a) Both parties hereto contemplate that Syndicate will be required to make a deposit with the building and loan association to which it expects to sell these mortgages, which deposit will guarantee such purchaser against any loss of any sort arising out of any default in payments by any mortgagor. The Companies will pay to the Syndicate at the time of the closing of the sale of these mortgages an amount equal to one-half of the deposit so required to be made as above described; but in no event more than Fifty Thousand ($50,000) Dollars. Twenty (20%) percent of the amount so deposited by the Companies with the Syndicate shall be refunded to the Companies at the end of each twelve months' after the date hereof, without interest, after first deducting any expense incident to default by any mortgagor.

"2. (b) Syndicate shall notify, in writing, the Companies of any default immediately upon the receipt of notice of such default from the purchaser of these mortgages to allow the Companies at their option to cure said default, or the like. If the Companies fail to repurchase such mortgages or cure such default, then the same shall be done out of the Companies' share of the above described fund.

"3. In the event the purchasers [sic] as procured by the Syndicate issues its commitment to purchase the mortgages as described in Schedule A attached hereto subject only to appraisal and credit reports on the individual houses and mortgagors, then the Companies agree to cause said appraisals to be made and to pay for same; to cause title to be brought down to date with a mortgagee policy not exceeding the amount of the then unpaid principal balance on each house, each of which mortgage policies shall indicate a clear and merchantable title; to pay for credit reports on each individual mortgagor and to pay all transfer taxes required by the State of Georgia.

"4. All of the agreements of the Companies as above set out are contingent on handling the transaction in a fashion whereby there will be no liability on either of the Companies for income tax on the unrealized profit on the sale of the mortgages above described.

"5. This agreement shall expire on August 1, 1959 unless the transaction shall have been sooner consummated."

8. Taxpayers, their officers or stockholders in fact employed an attorney, D. C. Markstein, Jr., to advise them regarding the transaction and its tax consequences.

satisfactory results obtained. All costs incurred in carrying out these appraisals were paid by Taxpayers.

By letter dated July 29, 1959, Taxpayers' tax counsel Markstein advised Jursich that the May 20 agreement could not be completed.[9] Apparently thinking in terms of making a new agreement, he informed Jursich that "everything has been done on the part of my client, to permit closing of this transaction * * *." And he urged Jursich to come to Birmingham to negotiate a workable solution. The parties were unable to agree on a suitable solution, and on August 7, Syndicate, by Jursich, rescinded the May 20 agreement. Syndicate executed two releases, one to First Federal and one to Taxpayers, absolving them of all liability arising from the May 20 agreement. For its release Taxpayers paid Syndicate a total of $7,500.[10] Under Taxpayers' release, to which Taxpayers were parties and perhaps the principal beneficiaries, Jursich agreed to form a new corporation, which would purchase the stock of, and then dissolve, Taxpayers and immediately thereafter sell the mortgages to First Federal.[11]

Jursich then or shortly thereafter fell out of the picture. He never formed, procured or supplied the new corporation as contemplated. In the meantime, back on Blueberry, Taxpayers and their stockholders remained anxious to dispose of the mortgages. And First Federal, as it had since May 22, remained a willing, hopeful buyer of them.

And, of course, this mutual interest did not remain concealed. For following the withdrawal of Jursich and Syndicate, Taxpayers' stockholder Cohen was in close contact with First Federal and suggested that it, either directly or through an intermediary, purchase Taxpayers' stock from their stockholders, dissolve Taxpayers, and thus obtain the mortgages. This First Federal refused to do. Disappointed at the turn of events, Taxpayers and their stockholders, now acutely conscious of the tax problems involved, were unwilling to sell outright the mortgages to First Federal, but instead insisted on using the sale-of-stock form. By this time, of course, Taxpayers had two set-backs. First, Jursich had defaulted on his promise (see note 11, supra) to supply an acquiring corporation. And, now, First Federal declined to supply one.

And now enters Deal. As one of the terms of the proposed transaction, First

9. The letter in part stated:
"This will confirm our telephone conversation of today. Enclosed is a photostatic copy of the list furnished to me by First Federal showing the amounts to be pledged on each mortgage, totaling $96,289.00.

"I think it is important for you to come to Birmingham as promptly as possible to discuss our agreement of May 20. In my opinion the agreement cannot be closed in its present form for several reasons. For example:

"1. Your commitment letter of June 25 limits the deposit to 30 per cent on any one mortgage; whereas enclosed list exceeds this figure in many instances.

"2. Your pledge agreement with First Federal calls for a release of the pledge deposits at the rate of ⅔ per cent of the principal paid off by the mortgagor each six months; whereas we expect 20 per cent of our deposit to be released each year * * *.

"3. Thirty-three of the mortgages are now in default. On August 1 several additional mortgages will become in default. We must have some understanding about how to handle these defaults because First Federal refuses to purchase any mortgages in default.

"The contract of May 20 is impossible of performance, in my opinion. If a new contract is to be made, it should be done promptly * * *."

10. Taxpayers paid $5,000 upon execution of the release, and the $2,500 balance was payable upon the consummation of the sale if it took place without participation by Syndicate or Jursich.

11. The release read: "All parties hereto contemplate that John T. Jursich * * * will personally cause to be formed the new corporation * * *, which corporation will purchase the stock of the [Taxpayers], and will immediately thereafter cause the [Taxpayers] to be dissolved and then sell the said mortgages to said First Federal * * *."

Federal required that Taxpayers obtain title insurance policies from Lawyers Title Insurance Corporation on the properties covered by the mortgages. W. Roscoff Deal, an attorney in Bryan County who represented Taxpayers locally, was the only attorney in Bryan County authorized to issue such policies. During July 1959, Deal was advised of the First Federal negotiations and contacted First Federal regarding the issuance of the title policies. Deal knew generally the nature of the proposed transaction, and was told of the breakdown after the withdrawal of Jursich and Syndicate and First Federal's refusal to purchase Taxpayers' stock.

Upon being advised of the halt in negotiations, Deal, with personal assets of but a few thousand dollars and no record-demonstrated credit facilities, came forward with an offer to purchase the stock of Taxpayers from their stockholders and complete the transaction with First Federal. The circumstances surrounding this offer are anything but clear, much less convincing to a trier.[12] But the upshot of it was that Deal then formed a corporation (Pemrich) with a capitalization of $202.[13] Without so much as a written agreement between Pemrich and Deal, Pemrich and Taxpayers, or Pemrich and Taxpayers' stockholders, or either or any of them, regarding this sale, Pemrich purchased the stock of Taxpayers, dissolved them, and sold the mortgages to First Federal, all as previously planned and contemplated. Deal thus furnished the missing link—an intermediate purchaser. Intermediate, it was. But was it independent? Was it really Deal? Was the trier compelled to credit this as a genuine purchase?

Of course the formal action carried out this form. Thus on the day of Pemrich's formation, August 20, the directors and stockholders of Taxpayers held special meetings at which it was announced that they had sold all their stock in Taxpayers to Pemrich. Pemrich assumed control of Taxpayers and adopted for Taxpayers a voluntary plan of liquidation and dissolution. On the following day Pemrich, pursuant to First Federal's commitment of August 20,[14] conveyed the mortgages formerly held by Taxpayers to First Federal, and received therefor $480,383.73. On that day Pem-

12. A search of the record reveals several interesting but not very enlightening statements on this matter. Cohen testified as follows:

"Q. Well, will you tell the Court the substance of your negotiations with Mr. Deal?

"A. At the time Jursich withdrew and I had discussed with Mr. McLamb [of First Federal], and they were not by law allowed to purchase it [Taxpayers' stock], and Mr. McLamb personally wasn't interested, I went back and told Mr. Deal that our negotiations had temporarily halted, that I would secure another purchaser; and he said, well, if everything was such as it is, he said he would be glad to be that purchaser. So, we told him that he knew the whole situation, he was the local man on the scene and knew the property, and knew the people, and it would be a good thing for him to purchase it, and he agreed."

Deal was equally vague:

"Q. Will you explain to the Court how it came about that you ceased to negotiate with McLamb on behalf of your former clients [Taxpayers] and began to negotiate on your own behalf?

"A. Yes, I will try to explain that. The plan was, we created a corporation for Mr. Jursich, and I believe that was on the 17th of August—I believe that's right, the 17th of August—and it developed that Mr. Jursich was not interested in making the purchase. So, later on, I talked to Mr. Cohen, and in our general discussion, I told him well, perhaps, I knew the set-up pretty well, that under the right inducement that I would be willing to buy the stock—form a corporation and buy the stock—and that is what eventually happened."

13. On August 20, 1959, Deal formed Pemrich Corporation under the laws of Georgia. Of the 202 shares of $1 par value common stock issued, 200 were issued to Deal, one to his secretary, and one to another Bryan County attorney. The total capitalization was $202.

14. By letter dated August 20, 1959, First Federal offered to purchase the mortgages from Pemrich on basically the same terms of the May 20 agreement, note 7, supra.

rich disbursed substantially all of this fund.[15] After the dust settled, Pemrich retained as an apparent profit on the transaction $1,931.71.

But Taxpayers and their stockholders were a long way from being divorced from the transaction. For on conveyance of the mortgages to First Federal, Cohen and Levine opened 103 savings accounts with First Federal as collateral security for the 103 mortgages conveyed to First Federal by Pemrich. These saving accounts totaled fifteen per cent of the original sales price of the mortgaged properties. This was no gratuitous act. On the contrary, First Federal insisted on this security throughout its discussions regarding the purchase of the mortgages, and this was Levine's and Cohen's way of satisfying this demand.[16]

Pemrich continued in existence after the First Federal transaction, but has transacted an insignificant amount of business since then. It has filed an income tax return for each year of its existence, and in July, 1963, did purchase a house which it is purportedly holding for resale.

Although, in the light of Taxpayers' burden of overcoming the presumptive correctness of the Commissioner's finding, there is an appalling lack of record evidence, it is abundantly clear that the trier was warranted in thinking there is

15. The disbursements were as follows:

| Check No. | Purpose of Payee | | Amounts |
|---|---|---|---|
| 1 | Appraisals and miscellaneous | | $ 8,787.50 |
| 2 | Attorney fees and expenses | | 12,000.00 |
| 3 | Release settlement to Syndicate (partial consideration) | | 2,500.00 |
| 4 | Title insurance | | 1,312.75 |
| 5 | Appraisals | | 75.00 |
| 6 | Accountant | | 200.00 |
| | Satisfaction of notes of Richmond to— | | |
| 7 | Harold Levin | $1,500.00 | |
| 8 | Marc Levine | 12,355.00 | |
| 9 | Marc Levine, Inc. | 85,311.77 | 99,166.77 |
| | Satisfaction of notes of Blueberry to— | | |
| 10 | Harold Levin | 13,000.00 | |
| 11 | Marc Levine | 44,345.00 | 57,345.00 |
| | Purchase of stock | | |
| 12 | Marc Levine | 148,448.36 | |
| 13 | David W. Cohen | 118,758.68 | |
| 14 | Harold Levin | 29,689.67 | 296,896.71 |
| | Miscellaneous | | |
| 18 | Recording dissolutions of petitioners | | 80.00 |
| 24 | Certificate of dissolutions | | 10.00 |
| 26 | Marc Levine, adjust stock price | | 1.64 |
| 27 | David W. Cohen, adjust stock price | | 1.32 |
| 28 | Harold Levin, repayment of attorney fee to Mr. Clark, as attorney for Pemrich on the dissolutions of petitioners | | 75.00 |
| | Total | | 478,452.02 |

16. Levine and Cohen thereby individually assumed the obligations imposed on Taxpayers and Syndicate by paragraph 2 of the May 20 agreement, note 7, supra. This was renewed in paragraph 3 of First Federal's commitment to Pemrich of August 20. Pemrich was required to "secure * * * deposits * * * in an amount equal to 15% * * * to be pledged as additional collateral * * *." According to Cohen, Deal insisted on this being done by Cohen and Levine as part of his agreement to purchase the stock in Taxpayers.

more than meets the eye regarding Pemrich and its role in the First Federal transaction. It is undisputed that all parties, including Deal, were fully aware of the pending First Federal purchase prior to Deal's and Pemrich's participation. Neither Deal—a lawyer in this small community with admittedly meager assets, who in Pemrich was forming his first personal corporation—nor Pemrich—a corporation of the "thinest" capitalization by any standards—had the resources or capital, or even the inclination, to carry out the purchase of Taxpayers' stock from their stockholders. Were Taxpayers' stockholders about to commit themselves to sell stock having a value of half a million dollars on the implied promise of this assetless corporate shell? It is plain that Pemrich was entirely dependent on the pre-existing negotiations between Taxpayers and First Federal. Taxpayers' stockholders and Pemrich all knew that Pemrich was able to carry out the purchase of Taxpayers' stock only by selling the mortgages to First Federal. And for this First Federal insisted on security deposits of fifteen per cent. Neither Pemrich nor Deal had this sort of available cash, so Taxpayers' former stockholders had to make these deposits. What all of these parties, living and corporate, so well understood the trier hardly had to ignore.

We have no doubt that the Tax Court was warranted in concluding that the Commissioner could properly disregard the intermediate step involving Pemrich and treat the disposition of the mortgages as a sale thereof by Taxpayers. On that finding the Taxpayers realized a substantial gain due to the unrealized profits in the installment obligations, for which the deficiency was due.

The Tax Court, in a very thorough, well-reasoned opinion, concluded that negotiations for the sale of Taxpayers' mortgages and installment obligations to First Federal were in a realistic sense completed and agreed upon before Taxpayers' stock was transferred to Pemrich; and that Pemrich was created and utilized solely as a conduit for the transfer of the mortgages from Taxpayers to First Federal.[17] Looking to the accepted substance versus form principles enunciated in Gregory v. Helvering [18] and Commissioner of Internal Revenue v. Court Holding Co.,[19] the Tax Court viewed the entire transaction as a single integrated plan, designed to enable Taxpayers to sell their mortgages to First Federal without being taxed on the proceeds of the sale. It disregarded as unreal the intermediate step whereby Pemrich acquired and then liquidated Taxpayers.

■ Considering the role we play, we point out that the case has been fully tried and factual determinations have been made by the Tax Court. As with decisions of the District Courts in civil actions tried without a jury,[20] the fact findings of the Tax Court must be accepted by us unless "clearly erroneous." [21]

17. We deem these findings important enough to set them out in full:
    "Negotiations for the transfer of the installment obligations to First Federal were conducted by representatives of petitioners in behalf of petitioners. The basic objective of the negotiations was to consummate a sale of the installment obligations from petitioners to First Federal. An agreement to complete the transaction was agreed upon by representatives of petitioners and First Federal before petitioners' stock was transferred to Pemrich.
    "Pemrich was created and utilized in this transaction solely as a conduit for the transfer of the installment obligations from petitioners to First Federal in an effort to avoid taxation of the gain on the transfer to petitioners and to permit petitioners' stockholders to recover their investments in petitioners at capital gains rates."

18. 1935, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596.

19. 1945, 324 U.S. 331, 65 S.Ct. 707, 89 L.Ed. 981.

20. Int.Rev. Code of 1954 § 748(a), 26 U.S. C.A. § 7482(a).

21. Taxpayers, quoting from Thomas v. Commissioner, 5 Cir., 1958, 254 F.2d 233, 236, that "if the conclusion of the trial court as to the ultimate fact is merely, as here, a product of legal reasoning, that conclusion is subject to appellate review

Commissioner of Internal Revenue v. Duberstein, 1960, 363 U.S. 278, 289–291, 80 S.Ct. 1190, 4 L.Ed.2d 1218.

Of importance is the fact that throughout the period here in question, Taxpayers' stockholders quite plainly desired to dispose of Taxpayers' principal, if not only, asset, the mortgages. It is also apparent that—if not at the outset then by at least the time the first deal aborted—Taxpayers' stockholders were aware of, and concerned about, income taxes, and wanted to avoid having Taxpayers taxed on the unrealized profits to be made from the mortgages and installment obligations. This, of course, meant that Taxpayers could not themselves dispose of the mortgages.

Thus it was necessary to devise an indirect method whereby the mortgages could be sold. Ordinarily the stockholders of a corporation, desiring to dispose of the assets of their corporation without having the corporation taxed on the income resulting therefrom, have at least two alternatives: they may sell all the stock in their corporation;[22] or they may liquidate their corporation.[23] But because the assets here involved were installment obligations, only the former route was available.[24] Moreover, if the stockholders could arrange the disposition of Taxpayers and their assets in the form of a sale of the stock in Taxpayers, not only would Taxpayers escape taxation, but also the stockholders would thereby convert what would have been ordinary income (the unrealized profits of the installment obligations) into capital gains.[25] Certainly this was an added

incentive to utilize the sale of stock method of disposing of Taxpayers.

■ We have said many times, and we here reiterate, that one may not only lawfully yearn for tax savings, but he may utilize and exploit every available legitimate means of arranging his affairs to achieve this end. Thus Taxpayers and their stockholders were entitled to avail themselves of the sale of stock method of disposing of Taxpayers if they so chose. But the stumbling block here is that First Federal, which throughout this transaction was the only party actually interested in obtaining Taxpayers' mortgages, could not—and hence would not—itself purchase Taxpayers' stock from the stockholders, because of restrictions on the types of investments open to it. This made necessary the use of an intermediary, which would purchase all of Taxpayers' stock, liquidate Taxpayers into it and thereby obtain their assets (principally the mortgages), and then sell the mortgages to First Federal.

This plan certainly presents a legitimate method whereby the stockholders of one corporation can dispose of their stock to a second corporation, which in turn liquidates, and sells the assets of, the acquired corporation. If this actually takes place, a transaction conducted in this way would be upheld and given effect for Federal income tax purposes. But the question here is not whether a plan of this type is valid or invalid. The question rather is whether under the circumstances of this case, the plan was really what it purported to be. Stated another way, the issue is whether in substance the transaction was as formally

---

free from the restraint of the clearly erroneous rule," argue that since the facts are not disputed in this case, we should look at the facts anew. We can think of few things which are more "factual" than form versus substance. The subtle factors leading to a conclusion on this issue are factual in essence and for primary resolution by the trier of fact. By all standards the findings pass muster, so much so that dependent analysis of the various factors here involved, our conclusions would parallel those of the Tax Court.

22. See 3B Mertens § 22.53.

23. See 7 Id. § 38.27.

24. By virtue of §§ 336, 337, and 453(d), distribution of the installment obligations to Taxpayers' stockholders in a liquidation would have resulted in the recognition of taxable income to Taxpayers, as well as recognition of ordinary income to Taxpayers' stockholders upon their disposition thereof. See 2 Mertens § 15.26.

25. See note 22, supra.

cast by the parties; and if not, whether the form, or the substance, should control for tax purposes.

We must take guard against oversimplification, for a glib generalization that substance rather than form is determinative of tax consequences not only would be of little assistance in deciding troublesome tax cases, but also would be incorrect. The fact—at least the tax world fact—is that in numerous situations the form by which a transaction is effected does influence and may indeed decisively control the tax consequences. This generalization does, however, reflect the fact that courts will, and do, look beyond the superficial formalities of a transaction to determine the proper tax treatment.[26]

In the landmark case of Gregory v. Helvering, 1935, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596, the Supreme Court refused to give effect to corporate transactions which complied precisely with the formal requirements for nontaxable corporate reorganizations, on the ground that the transactions had served no function other than that of a contrivance to bail out corporate earnings to the sole stockholder at capital gains tax rates. In Commissioner of Internal Revenue v. Court Holding Co., 1945, 324 U.S. 331, 65 S.Ct. 707, 89 L.Ed. 981, the Supreme Court taxed a corporation on the gain from the sale of an apartment house notwithstanding a transfer of the house to the corporation's two stockholders before the sale, since it found that the transfer was made solely to set in a more favorable tax form a sale which in reality was made by the corporation. Of course as the Court recognizes and states, each case must be decided on its own merits by examining the form and substance of the transaction and the purpose of the relevant tax provisions to determine whether recognition of the form of the transaction would defeat the statutory purpose.

This Court has unhesitatingly accepted and applied the principles of Gregory and Court Holding.[27] In Hindes v. United States, 5 Cir., 1964, 326 F.2d 150, cert. denied, 1964, 377 U.S. 908, 84 S.Ct. 1168, 12 L.Ed.2d 178, a case strikingly similar to this one, the taxpayer purportedly sold his farm to a corporation, incorporated shortly before the sale and owned by the taxpayer's mother and father and his lawyer, which immediately sold the farm to a purchaser who had previously expressed interest in the farm. The facts revealed that the taxpayer, to minimize his taxes, desired to dispose of the farm through an installment sale. The purchaser, on the other hand, insisted on paying the entire purchase price in cash. Using the intermediate corporation, both were satisfied: the taxpayer sold his farm to the corporation in an installment sale, and the purchaser bought the farm from the corporation for cash. This Court affirmed the Trial Court's disregard of the form of the transaction, and upheld its findings that the intermediate corporation served no purpose and that the sale was in fact made by, and taxable to, the taxpayer.[28]

The evidence presented in our case fully supports, indeed requires, the conclusion that in reality Taxpayers, not Pemrich, negotiated and completed the sale of the mortgages to First Federal, and that Taxpayers therefore are taxable on the proceeds from that sale.

Our holding does not rest on the abortive deal with Syndicate. But the May

---

26. See generally 2 Mertens §§ 17.05–.05a, 17.12; 3 Id. §§ 20.161–.163, 20.165; 7 Id. §§ 38.11–.13.

27. See, e. g., Willow Terrace Dev. Co. v. Commissioner, 5 Cir., 1965, 345 F.2d 933, cert. denied, 1965, 382 U.S. 938, 86 S.Ct. 389, 15 L.Ed.2d 349; General Guar. Mortgage Co. v. Tomlinson, 5 Cir., 1964, 335 F.2d 518; United States v. General Geophysical Co., 5 Cir., 1961, 296 F.2d 86, cert. denied, 1962, 369 U.S. 849, 82 S.Ct. 932, 8 L.Ed.2d 8; Liston Zander Credit Co. v. United States, 5 Cir., 1960, 276 F.2d 417, and cases cited at 418 n. 1.

28. See also S. Nicholas Jacobs, 1953, 21 T.C. 165, aff'd, Jacobs v. Commissioner of Internal Revenue, 9 Cir., 1955, 224 F.2d 412.

20 agreement (note 7, supra) reflects quite plainly that the essence of the transaction was the sale of Taxpayers' mortgages. And none of the actions *vis-a-vis* Taxpayers and First Federal and Pemrich thereafter ever reflects that there was any change in this purpose or desire.

In these circumstances it is clear to us that Pemrich, insofar as regards this transaction, in actuality served no real or useful economic purpose apart from tax savings. Pemrich was a tool, a mere conduit, created because of—and virtually by—and for the primary benefit of, Taxpayers and their stockholders, to enable Taxpayers in fact to make the sale of their mortgages to First Federal, but without tax consequences.[29] In full agreement with the Tax Court, that Taxpayers in fact made this sale and thus are taxable on it, we affirm its decision.

■ Nothing here said is intended to prevent or in any way discourage a real and bona fide sale of stock by stockholders of one corporation to a second corporation, and liquidation of the first by the acquiring corporation to obtain its assets. The cases cited by Taxpayers hold, and correctly so, we believe, that the formalities of such a transaction will be given controlling effect for tax purposes.[30] But missing here is that all-important element—the transaction must be real and bona fide. That means at least that where tax consequences require that the acquiring corporation be independent, the plan fails if it is in fact the agent, or tool, of the selling stockholders or their corporation. It is here, as the Tax Court so ably demonstrated, that the form breaks down. The Deal deal was not the real deal. That ends it.

Affirmed.

29. We need not, and do not, decide whether Pemrich's corporate form should be disregarded for all purposes. What we do hold, and all that is necessary here, is that the formal aspects of Pemrich and its activities do not accurately reflect the substance of the First Federal transaction, and do not control the tax consequences flowing therefrom.

30. E. g., Merka Holding Co., 1956, 27 T.C. 82; Dallas Downtown Dev. Co., 1949, 12 T.C. 114; Steubenville Bridge Co., 1948, 11 T.C. 789.