**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**

November 10, 2009

Charles R. Fulbruge III
Clerk

No. 08-20261

ENBRIDGE ENERGY COMPANY INC; ENBRIDGE MIDCOAST ENERGY
LP, formerly known as Enbridge Midcoast Energy Inc, formerly known as
Midcoast Energy Resources Inc

Plaintiffs - Appellants

v.

UNITED STATES OF AMERICA

Defendant - Appellee

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:06-CV-657

Before BARKSDALE, DENNIS, and ELROD, Circuit Judges.

PER CURIAM:[*]

Plaintiffs-Appellants Enbridge Energy Company, Inc. and Enbridge
Midcoast Energy, L.P. (collectively, "Midcoast") brought this suit for a refund of
taxes and penalties assessed by the Internal Revenue Service ("IRS" or
"Commissioner"). In 1999, Midcoast acquired the control of the Bishop Group
("Bishop"), which operated various energy-related pipelines. The change of

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not
be published and is not precedent except under the limited circumstances set forth in 5TH CIR.
R. 47.5.4.

control took the form of a conduit transaction, whereby Bishop's sole shareholder sold his stock to a third-party intermediary (the K-Pipe Merger Corporation, or "K-Pipe"), which then immediately sold the formerly Bishop assets to Midcoast. The IRS, applying the "substance over form" doctrine, disregarded the use of the conduit in the transaction, treating the transaction as a direct stock sale for tax purposes -- resulting in less favorable tax treatment for Midcoast. After paying due taxes and penalties under protest, Midcoast brought the instant suit claiming the IRS erroneously treated the transaction as a direct stock sale and erroneously assessed a 20% penalty. The district court granted summary judgment to the IRS on both claims. For the following reasons, we affirm.

## I. BACKGROUND

The material facts of this case are undisputed, and the district court ably and accurately recited them in its memorandum opinion and order. *See Enbridge Energy Co. v. United States*, 553 F. Supp. 2d 716 (S.D. Tex. 2008). We highlight the most salient facts here.

Midcoast and Bishop were in the business of owning and operating natural gas pipelines. Dennis Langley was Bishop's sole shareholder, and thus controlled Bishop's assets, which consisted primarily of natural gas pipelines. Beginning in 1999, Langley decided to sell Bishop. Specifically, Langley sought to sell his stock in Bishop because a direct stock-sale would be substantially more beneficial to him from a tax perspective than a sale of only the entity's assets. Langley arranged with Chase Securities, Inc. to solicit potential buyers of the Bishop stock.

Midcoast was an interested buyer, but preferred to purchase Bishop's assets rather than Langley's stock. Midcoast's preference for purchasing the Bishop's assets stemmed from a desire to avoid the tax liability that would result from purchasing Langley's stock. Midcoast nonetheless submitted a series of non-binding, conditional bids for the purchase of the stock, none of which led to

a final sale agreement. In September 1999, after conducting further due diligence, Midcoast reduced its bid price for the stock to $163 million, a price below what Langley had sought for the stock. As Midcoast's general counsel has averred, this bid "resulted in a significant gap between the price Midcoast was willing to pay and the price Langley indicated he was willing to accept."

At approximately this same time, Midcoast consulted with an outside tax advisor, PricewaterhouseCoopers, LLP ("PWC"), concerning the transaction. PWC first suggested the idea of using a "midco transaction," in which Langley would sell his Bishop stock to a third party, and the third party would in turn sell the Bishop assets to Midcoast. This arrangement, PWC advised, would provide tax benefits for both Midcoast and Langley. PWC suggested that Midcoast use Fortrend International LLC ("Fortrend"), an investment bank, to facilitate the transaction. Thomas J. Palmisano, then a senior manager with PWC, testified that his firm contacted Fortrend to facilitate the Midco transaction specifically so that "Midcoast [would] receive a stepped-up basis in the [Bishop] assets. And by doing so, it would give [Midcoast] an ability to increase the amount of consideration for the assets." Recognizing the benefits of the Fortrend-facilitated midco transaction, Midcoast agreed because, as Midcoast's CFO testified, "this was the only thing that we felt could close" the gap between Langley's requested price and Midcoast's offer.

Fortrend began negotiating with Langley to acquire his Bishop stock, with Midcoast and PWC participating in the negotiations and often dealing directly with Langley. Fortrend created an entity, K-Pipe, specifically for the transaction. K-Pipe had no assets of its own, nor had it conducted any prior business. On September 30, 1999, K-Pipe submitted a letter of intent to Langley containing its offer to purchase the Bishop stock. The following day, October 1, 1999, Midcoast submitted a letter of intent to K-Pipe containing its offer to purchase the Bishop assets. Approximately one week later, following the

letters of intent, K-Pipe purchased all of Langley's Bishop stock; the next day, K-Pipe sold all of Bishop's assets to Midcoast, save for a royalty interest (described as the Butcher Interest) held by Bishop that K-Pipe sold to a partnership consisting of K-Pipe and Midcoast. K-Pipe financed its purchase of Langley's stock with a loan obtained from Rabobank Nederland, a Dutch bank known for financing midco transactions, which was entirely secured by funds totaling $191.1 million that Midcoast deposited in escrow with Rabobank. K-Pipe transferred approximately $122.5 million to Langley in consideration for the stock; Midcoast transferred $122.6 million to K-Pipe in consideration for the assets, and an additional $79 million directly to Bishop's creditors. The difference in price between the stock purchase price and the asset sale price was $6.4 million, representing K-Pipe's (and therefore Fortrend's) commission.

K-Pipe retained title interest to the Bishop stock, equity in the Butcher Interest, and certain causes of action against third parties (as well as the difference between the purchase price of the stock and sale price of the assets). K-Pipe continued in existence through at least 2002, though its annual tax filings show that it conducted virtually no business. Subsequent to the stock-asset sale, in November 2000, Midcoast paid K-Pipe $244,750 for K-Pipe's equity in the Butcher Interest by exercising an effectively mandatory purchase option it retained from the original transaction. Midcoast subsequently terminated the Butcher Interest and deducted an alleged loss on its 2001 corporate tax return of approximately $5.7 million.

Midcoast claimed an adjusted basis in the former Bishop assets in tax year 1999 equal to the $192 million it paid for them. In subsequent years, Midcoast began claiming deductions based on the depreciation of those assets. The IRS instituted an audit and partially disallowed those deductions, finding that Midcoast should have paid taxes as though it purchased the stock of Bishop. Accordingly, the IRS disregarded the form of the conduit transaction and treated

4

it as though Midcoast directly purchased the stock of Bishop. The IRS permitted Midcoast to claim a carryover basis of $35 million in the assets (the basis that Bishop could have claimed) and make deductions based on that amount. The IRS also assessed a 20% penalty due to the substantial underpayment of taxes. Midcoast paid approximately $5.4 million to the IRS under protest. Thereafter, Midcoast sought a refund of that payment. When the IRS denied the refund, Midcoast brought the instant suit to obtain the refund.

On the parties' cross-motions for summary judgment, the district court granted summary judgment to the United States, concluding that Midcoast failed to meet its burden to prove that the IRS erroneously disregarded the form of the conduit transaction. The district court also held that the IRS was permitted to assess the 20% penalty. Midcoast timely appealed.

## II. STANDARD OF REVIEW

"The general characterization of a transaction for tax purposes is a question of law subject to review." *Frank Lyon Co v. United States*, 435 U.S. 561, 581 n.16 (1978). We review the district court's grant of summary judgment *de novo*. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007). A party is entitled to summary judgment only if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). On a motion for summary judgment, the court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in its favor. *See Hockman v. Westward Commc'ns, LLC*, 407 F.3d 317, 325 (5th Cir. 2004). In reviewing the evidence, the court must "refrain from making credibility determinations or weighing the evidence." *Turner*, 476 F.3d at 343.

5

## III.  DISCUSSION

### A.     Substance Over Form

The Supreme Court held in *Commissioner v. Court Holding Co.*, 324 U.S. 331 (1945), that the IRS may assess taxes based on the substance, rather than the form, of a conduit transaction.   The Court explained:

> The incidence of taxation depends upon the substance of a transaction.  The tax consequences which arise from gains from a sale of property are not finally to be determined solely by the means employed to transfer legal title.  Rather, the transaction must be viewed as a whole, and each step, from the commencement of the negotiations to the consummation of the sale, is relevant.  A sale by one person cannot be transformed for tax purposes into a sale by another by using the latter as a conduit through which to pass title.  To permit the true nature of a transaction to be disguised by mere formalisms, which exist solely to alter tax liabilities, would seriously impair the effective administration of the tax policies of Congress.

*Id*. at 334.  The Court reaffirmed this holding in *United States v. Cumberland Public Service Co.*, 338 U.S. 451 (1950), and observed that in applying the substance-over-form principle, the court "can consider motives, intent, and conduct in addition to what appears in written instruments used by parties to control rights as among themselves." *See id*. at 455 n.3.  The Supreme Court has also cautioned, however, against disregarding legitimate transactions, stating that "where . . . there is a genuine multiple-party transaction with economic substance which is compelled or encouraged by business or regulatory realities, is imbued with tax-independent considerations, and is not shaped solely by tax-avoidance features that have meaningless labels attached, the Government should honor the allocation of rights and duties effectuated by the parties." *Frank Lyon,* 435 U.S. at 583-84.

We have applied the substance-over-form doctrine on numerous occasions, beginning with our decision in *Davant v. Commissioner*, 366 F.2d 874 (5th Cir. 1966), to conclude that the sale of a corporation's assets through an intermediary

to avoid capital gains taxation could be treated as a direct sale, thus triggering a higher rate of taxation. *Davant* involved taxpayers who sold their stock in a corporation and attempted to claim a lower capital gains rate for the sale. To accomplish this, the taxpayers sold their stock to an intermediary who would "make a reasonable profit" for his role,[1] and then the intermediary would sell the corporation's assets to a buyer (in this case, another corporation owned by the taxpayers) and liquidate the target corporation. *See id*. at 878. The taxpayer argued that the transaction was a bona fide sale of his stock in the corporation, while the IRS argued that the transaction should have been treated as a corporate reorganization and taxed at a higher ordinary income rate. *See id*. at 879. We agreed with the IRS's determination, stating that the "courts have never been shackled to mere paper subterfuges. It is hard to imagine a transaction more devoid of substance than the purported 'sale' to [the intermediary]." *Id*. at 880. This court specifically noted that the intermediary "served no function other than to divert our attention to avoid tax. Stated another way, his presence served no legitimate nontax-avoidance business purpose." *Id*. at 881. There was thus no merit in the taxpayers' argument that a stock sale could not be treated as a sale of assets: "[W]e see that the treatment of stocks as assets, or assets as stock, has always been utilized by the courts in harmonizing the statutory language with the single rational plane of taxation envisioned by Congress." *Id*. at 887.

Similarly, in *Blueberry Land Co. v. Commissioner*, 361 F.2d 93 (5th Cir. 1966), the taxpayers sought to sell their corporations' assets. After finding a buyer, the taxpayers and the buyer began negotiating the sale and reached an agreement, but the deal fell apart because of the perceived adverse tax consequences. *Id*. at 94-96. At that time, an intermediary agreed to establish

---

[1] The intermediary received $15,583.30 for his role in the transaction. The entire sale was for approximately $1 million in consideration. *See Davant*, 366 F.2d at 878.

a holding company that would buy the taxpayers' stock, sell the assets to the buyer, and liquidate the corporations. *Id*. at 96-97. The intermediary established the holding company and accomplished the transaction, retaining a modest fee for his services. *See id*. The IRS sought to treat the transaction as a sham, and we agreed, specifically relying on the fact that the transaction had been negotiated by the taxpayer with the eventual buyer -- and that the intermediary "served no real or useful economic purpose apart from tax savings." *Id*. at 102. "Nothing here said is intended to prevent or in any way discourage a real and bona fide sale of stock by stockholders of one corporation to a second corporation, and liquidation of the first by the acquiring corporation. . . . But missing here is that all-important element -- the transaction must be real and bona fide." *Id*.

We also agreed with the IRS's substance-over-form determination in *Reef Corp. v Commissioner*, 368 F.2d 125 (5th Cir. 1966). The taxpayer in that case was a corporation owed by two groups of shareholders. One group sought to buy the other's interest in the corporation. The initial plan for accomplishing this goal was rejected by the sellers because of the adverse tax consequences, so the parties developed a new plan for using a new corporate entity and an intermediary to engage in a stock/asset swap in order to obtain a more favorable tax basis for the purchased assets. *Id*. at 128-29. We explained:

> [The intermediary] was a mere conduit in a preconceived and prearranged unified plan to redeem the stock of the [sellers]. His activity was but a step in the plan. He carried out a sales contract already entered into between the corporations. He assumed no risk, incurred no personal liability, paid no expenses and obtained only bare legal title to the stock. There was an insufficient shifting of economic interests to [the intermediary]. It is settled that under such circumstances substance must be given effect over form for federal tax purposes.

*Id*. at 130.

However, we have not always agreed with the IRS's application of the substance over form doctrine. In *Compaq Computer Corp. v Commissioner*, 277 F.3d 778 (5th Cir. 2001), the taxpayer (Compaq) purchased shares of a foreign corporation using an intermediary. The evidence established that the intermediary approached Compaq about buying the stock and that the intermediary "[w]ithout involving Compaq . . . chose both the sizes and prices of the trades and the identity of the company that would sell the [shares] to Compaq." *Id*. at 779-80. The IRS argued that the transaction should be disregarded, which would prevent Compaq from claiming favorable tax treatment on its capital losses and dividends. We disagreed, concluding that the transaction was motivated by a business purpose unrelated to obtaining tax benefits and "economic substance." *Id*. at 781-82. Specifically, we noted that the transactions "had both a reasonable possibility of profit attended by a real risk of loss and an adequate non-tax business purpose. The transaction was not a mere formality or artifice but occurred in a real market subject to real risks." *Id*. at 788.

**B.    Application to the Instant Case**

The uncontroverted evidence supports the district court's conclusion that this was a sham conduit transaction, and that Midcoast is not entitled to claim a stepped-up basis for the assets it purchased. Langley sought to sell his stock in Bishop, knowing that a direct asset sale would have negative tax consequences for him. As Midcoast concedes, Bishop's assets had appreciated considerably and the corporation would have to pay significant taxes on those gains, and Langley in turn would have to pay taxes on distributions he took as a shareholder from Bishop. Midcoast was one of many interested buyers and submitted a bid of $157 million for the stock, which it subsequently increased to $184.2 million, but then -- upon further reflection -- lowered to $163 million. Langley found this offer unacceptable.

When Langley rejected Midcoast's reduced offer, Midcoast asked its tax advisor, PWC, for suggestions about improving its bid. PWC suggested that the parties use a third-party intermediary for the transaction and suggested Fortrend, a corporation that has done a number of conduit transactions. PWC then brought Fortrend into the fold. The evidence shows that this was done to "bridge the gap" in the transaction -- referring to the agreed dispute over the sale price. Midcoast understood that Fortrend would buy Langley's stock and then sell the Bishop assets to Midcoast.

Fortrend, rather than buying the stock and selling the assets itself, formed a special vehicle solely for this purpose: K-Pipe. K-Pipe existed for no other purpose than to accomplish this transaction, and did no substantive business before or after it finished the transaction here. Although K-Pipe obtained financing for its purchase of Langley's stock, that financing was wholly secured by Midcoast's funds equal to the loan deposited in escrow accounts. Thus, while technically a loan, it was effectively no different than purchasing the stock with Midcoast's funds. That financing was obtained through a foreign bank known to finance these types of midco transactions. K-Pipe did not exist prior to the transaction's occurrence; it was created solely to buy the stock and sell the Bishop assets. The evidence shows that Langley and Midcoast were discussing the purchase prior to K-Pipe's involvement, that they met together -- along with PWC -- to discuss the deal, and that the sell/buy transactions occurred within 24 hours. This evidence supports only the inference that K-Pipe was merely an intermediary without a bona fide role in the transaction.

Indeed, Midcoast concedes that "Midcoast wanted to acquire the Bishop pipeline assets. But the only way Midcoast could acquire the Bishop assets at a price Midcoast was willing to pay was if a third party (K-Pipe) acquired Bishop's stock from Langley and then sold the assets to Midcoast." Midcoast articulates only three purported business reasons why it used a conduit

transaction rather than a direct asset purchase. First, Midcoast states that K-Pipe sought to earn a "profit." But this does not answer the question of why any party was willing to pay K-Pipe to be an intermediary. Moreover, as our case law shows, the mere payment of a fee or profit by the intermediary does not prevent finding that the transaction was a sham. Second, Midcoast states that it used the midco transaction form because it "wanted to acquire and operate the Bishop pipeline assets at a price it was willing and could afford to pay." This is not a tax-independent business consideration; the money Midcoast saved by lessening its tax burden allowed it to pay more for the assets.

Midcoast further contends that this transaction limited its exposure to litigation because, had it purchased the Bishop stock, it would have been liable for claims against Bishop. By purchasing only the assets, Midcoast contends, it could avoid liability on known and unknown claims that might be asserted against the Bishop corporate entity. But this in no way explains why an intermediary was necessary: The parties could have achieved the same result had Midcoast bought the assets directly from Langley and Bishop *without* using an intermediary. *See Polius v. Clark Equip. Co.*, 802 F.2d 75, 77 (3d Cir. 1986) ("Liability continues [in the context of a stock sale] because the corporate body itself survives. A different rule applies when one corporation purchases the assets of another. Under the well-settled rule of corporate law, where one company sells or transfers all of its assets to another, the second entity does not become liable for the debts and liabilities, including torts, of the transferor.").

Accordingly, the uncontroverted facts support the district court's determination that the IRS was entitled to disregard the form of the transaction and treat it as a direct sale of stock. Given that the transaction was designed solely for the purpose of avoiding taxes, and Midcoast has offered no adequate non-tax reasons for using a conduit entity, the district court did not err in finding the IRS appropriately disregarded the form of the transaction.

## C.    Penalty Determination

In addition to challenging the IRS's treatment of the conduit transaction, Midcoast's suit also challenges the imposition of a 20% underpayment penalty. We review the district court's decision on the penalty issue for abuse of discretion. *See Pan Amer. Life Ins. Co. v. United States*, 174 F.3d 694, 696 (5th Cir. 1999).

Midcoast makes two arguments against the district court's ruling that the IRS was permitted to assess the 20% penalty. First, Midcoast argues that because it did not underpay, then no penalty could be assessed. This argument necessarily fails in light of our decision above that Midcoast understated its income tax liability for this transaction. Alternatively, Midcoast argues that, even if the IRS is entitled to disregard the form of the conduit transaction, the IRS could not assess the penalty because Midcoast had "substantial authority" to support its actions.

The Internal Revenue Code generally provides for a 20% penalty for the "substantial understatement of income tax." 26 U.S.C. § 6662(a)&(b). However, a taxpayer is not subject to the penalty if the understatement is attributable to "the tax treatment of any item by the taxpayer if there is or was substantial authority for such treatment." *Id.* § 6662(d)(2)(B)(i). Even if there is substantial authority supporting the taxpayer's tax treatment, though, a taxpayer cannot avoid the penalty in the case of tax shelters. *Id.* § 6662(d)(2)(C). The Code defines a tax shelter as, *inter alia*, an entity or plan or arrangement "if a significant purpose of such partnership, entity, plan, or arrangement is the avoidance or evasion of Federal income tax." *Id.*

The district court ruled that there was no substantial authority for Midcoast's tax treatment of the transaction and that, in any event, the conduit transaction constituted a "tax shelter," making the substantial authority exception inapplicable. This was not abuse of discretion. First, all of the

available authority indicated that this transaction -- motivated solely by the avoidance of taxes -- would be disregarded and that Midcoast would not be entitled to claim a stepped-up basis for the Bishop assets. This authority took the form of both Supreme Court and Fifth Circuit precedent. Second, the uncontroverted evidence shows that the arrangement at issue in this case had the sole purpose of avoiding federal income tax. Thus, it falls squarely within the Code's definition of a "tax shelter." It is clear that tax avoidance was, at a minimum, a "significant purpose" of the arrangement as required by the statute. Accordingly, we affirm the district court's ruling that the IRS was permitted to assess a penalty against Midcoast pursuant to § 6662.

## IV. CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court.