ENBRIDGE ENERGY COMPANY, INC. and Enbridge Midcoast Energy, L.P. f/k/a Enbridge Midcoast Energy, Inc. f/k/a Midcoast Energy Resources, Inc., Plaintiffs

v.

UNITED STATES of America, Defendant.

Civil Action No. H–06–657.

United States District Court, S.D. Texas, Houston Division.

March 31, 2008.

Karl Scherrak Stern, Vinson & Elkins, Houston, TX, for Plaintiffs.

David B. Coffin, Dept of Justice, Tax Division, Dallas, TX, for Defendant.

### *OPINION AND ORDER*

MELINDA HARMON, District Judge.

Pending before the court in this federal tax suit are cross motions for summary judgment filed by the Plaintiffs (Doc. 24) and the Defendant (Doc. 23). Having considered these motions, the responses and replies thereto, the complete record before the court, and all applicable legal standards, and for the reasons articulated below, the court DENIES Plaintiffs' motion for summary judgment; and GRANTS Defendant's motion for summary judgment.

## I. Background and Relevant Facts

In November 1999, Dennis Langley ("Langley") allegedly sold all of the stock (the "Bishop Stock") of his solely-owned pipeline business, The Bishop Group, Ltd. ("Bishop"), to K–Pipe Merger Corporation ("K–Pipe"). With the sale of the Bishop Stock, Bishop simultaneously changed its name to K–Pipe Group, Inc. K–Pipe and K–Pipe Group, Inc. then merged, with K–Pipe Group, Inc. as the survivor ("K–Pipe Group"). The next day, the newly-merged K–Pipe Group allegedly sold substantially all of the assets of Bishop (the "Bishop Assets"), which consisted primarily of natural gas pipelines, to Midcoast Energy Resources, Inc. ("Midcoast"). Midcoast began taking depreciation and amortization deductions based on its acquisition of the Bishop Assets. The Government disallowed these deductions, as well as others, because it claimed that the overall transaction was a sham. The Government contends that, for federal tax purposes, K–Pipe's involvement should be disregarded and Midcoast should be treated as having acquired the Bishop Stock. Midcoast, having paid the taxes flowing from this characterization, as well as a twenty percent penalty, has brought the current suit to obtain a refund.

### A. *The Challenged Transaction(s)*

The material facts of this case are undisputed. In mid–1999, Langley decided to sell Bishop. Based on his tax advisors' advice, Langley was interested in a stock, rather than asset, sale because an asset sale would generate greater taxes. Engaging the services of an investment banking firm, Chase Securities, Inc. ("Chase"), Langley initiated a modified auction process to gauge interest in and contact potential buyers of the Bishop Stock. After signing a confidentially agreement, interested buyers were provided with a Confidential Offering Memorandum and invited to submit "preliminary non-binding indications of interest." (Gov't Ex. 9, Doc. 23).

One potential buyer was Midcoast, a publically-traded company engaged in the business of constructing and operating natural gas pipelines. Midcoast was interested in owning the Bishop Assets, which included an interstate natural gas pipeline system located in Kansas, Oklahoma, and Missouri, because the assets "provided a stable cash flow from long-term transportation contracts and would nearly double Midcoast's existing pipeline asset base, providing Midcoast with the critical mass it sought to achieve." (Kaitson Aff. ¶ 3, Doc. 26). On July 21, 1999, Midcoast responded to Chase with a preliminary non-binding indication of interest stating that it would be prepared to pay $157 million in cash for the Bishop Stock. (Gov't Ex. 9.1, Doc. 23). On August 30, 1999, after conducting due diligence, Midcoast sent Langley a non-binding proposal to purchase the Bishop Stock for $184.2 million, subject to certain conditions. (Gov't Ex. 25, Doc. 23). The proposal also included "supplemental offers" by Midcoast to give Langley (i) half of any rate increase that might result following an application by Bishop with the Federal Energy Regulatory Commission ("FERC"); and (ii) an opportunity to negotiate and enter into "Project Development Agreements" ("PDAs") concerning, *inter alia,* certain future pipeline expansion projects and the use of certain pipeline rights-of-way. (*Id.*). Langley did not accept this offer, but the negotiations continued. Due to continued due diligence, Midcoast's offer to purchase the Bishop Stock dropped to $163 million by the end of the first week of September 1999. (Kaitson Aff. ¶ 4, Doc. 26). According to Midcoast, "[t]his resulted in a significant gap between the price Midcoast was willing to pay and the price Langley indicated he was willing to accept." (*Id.*).

To help "bridge this gap," Midcoast's tax advisor at the time, PricewaterhouseCoopers, L.L.P. ("PWC"), suggested Midcoast pursue a "Midco transaction," whereby Langley could sell the Bishop Stock to a third party who would, in turn, sell the Bishop Assets to Midcoast. This structure would provide the best of both tax worlds: Langley would only be taxed once on his capital gains, and Midcoast would receive the step-up in basis on the Bishop Assets. Thus, PWC approached Fortrend International LLC ("Fortrend")[1] about "facilitating" Midcoast's purchase of the Bishop Assets. (*See* Palmisano Dep., dated Feb. 22, 2007, at 48, Doc. 23).

In early September 1999, Fortrend began negotiating with Langley about acquiring the Bishop Stock. Langley provided Fortrend with the same auction material that he had given to other potential bidders. Although they had not participated in the negotiations between Langley and the other bidders, Midcoast and PWC participated in the negotiations between Langley and Fortrend. For example, Langley's representative faxed to Fortrend and PWC a draft Mutual Confidentiality Agreement and a draft letter of intent (Gov't Exs. 35 and 36, Doc. 23), and Langley's representatives emailed to PWC a draft Stock Purchase Agreement between Fortrend and Langley, which was a red-lined version of the agreement that had been drafted between Midcoast and Langley, with Fortrend substituted for Midcoast (Gov't Ex. 37, Doc. 23). On September 30, 1999, K–Pipe Holdings Partners, L.P., affiliated with Fortrend and the holding company of K–Pipe Merger Corporation, submitted a non-binding letter of intent, offering to purchase the Bishop Stock for approximately $188 million. (Gov't Ex. 65, Doc. 23). The letter of intent also indicated that "other agreements" would be negotiated. (*Id.*).

On October 1, 1999, K–Pipe and Midcoast signed a non-binding letter of intent concerning the sale to Midcoast of the Bishop Assets. (Gov't Ex. 66, Doc. 23). In this letter of intent, Midcoast agreed to pay either $187,868,000 or $182,068,000 for the Bishop Assets, depending on certain variables. Additionally, the asset letter of intent provided that Midcoast could exercise its option to purchase the "Butcher Interest," a royalty interest that Bishop had acquired years earlier. Bishop had both an obligation to pay the royalty, as well as a right to receive payment; thus, no royalties were paid from 1989 to 1999.

The parties negotiated numerous issues in the lead up to the financing and execution of the final stock and asset purchase agreements (hereafter "Stock Purchase Agreement" and "Asset Purchase Agreement"). In general, Midcoast continued discussions with Langley regarding certain issues affecting the Bishop Assets. These issues included a PDA that Langley was causing Kansas Pipeline Company ("KPC"), a partnership included in the Bishop Assets, to enter with a Langley affiliate. (Kaitson Aff. ¶ 9, Doc. 26). Midcoast claims it became so concerned about a continuing relationship with Langley through the PDA that it indicated it would not buy the Bishop Assets unless there was a provision for terminating the PDA relationship. Langley, therefore, put in place an agreement giving KPC the option to terminate the PDA upon the payment of $10.75 million. K–Pipe agreed to pay Langley $3 million more for the Bishop Stock, and Midcoast agreed to pay K–Pipe

---

**1.** According to the promotional materials provided to Langley, Fortrend is an investment bank specializing "in structuring and managing economic transactions that accomplish specific tax or accounting objectives" by providing "unique" and "creative" planning techniques. (Gov't Ex. 26, Doc. 23).

a corresponding amount for the Bishop Assets.

With respect to the Stock Purchase Agreement, Langley requested that K–Pipe agree to pay a $15 million "break-up fee" if K–Pipe failed to close the Stock Purchase Agreement by November 15, 1999. (*See* Gov't Ex. 2–32, Doc. 23). K–Pipe also agreed not to liquidate Bishop for at least two years. (*Id.*). Finally, Fortrend agreed to guarantee K–Pipe's obligations under the Stock Purchase Agreement. (*See* Guaranty, Stern Aff. Ex. 30, Doc. 25).

With respect to the Asset Purchase Agreement, Midcoast agreed to pay K–Pipe $15 million if Midcoast failed to close the Asset Purchase Agreement by November 15, 1999. (*See* Gov't Ex. 1–5, Doc. 23).[2] Midcoast also agreed to be liable to any third-party donee or creditor beneficiaries of K–Pipe should the deal fall through. (*Id.*). Finally, Midcoast agreed to certain guarantees of K–Pipe's obligations under the Stock Purchase Agreement, including an obligation to indemnify Langley should he receive anything other than capital gain tax on the sale of the Bishop Stock to K–Pipe.[3]

Langley and K–Pipe executed the Stock Purchase Agreement on November 4, 1999, effective as of October 25, 1999. (*See* Stock Purchase Agreement, Gov't Ex. 2–34, Doc. 23). The following day, November 5, 1999, K–Pipe and Midcoast executed the definitive Asset Purchase Agreement. (*See* Asset Purchase Agreement, Gov't Ex. 1–4, Doc. 23).

K–Pipe financed its acquisition of the Bishop Stock with a loan from Rabobank Nederland ("Rabobank"). Although Fortrend had requested a 30–day secured term loan for an amount up to $195 million, the loan was expected to be repaid in a week. (Gov't Ex. 85, Doc. 23). As part of its protection regarding the loan, Rabobank required the following "pledges": (i) the membership interest of K–Pipe Holdings Partners, L.P.; (ii) an escrow account in the name Langley, established at Rabobank, into which the $195 million would be deposited and would be distributed upon the closing of the sale of the Bishop Stock; and (iii) a second escrow account held at Rabobank with account balances in excess of $200 million, which Midcoast would establish through its own secured financing with Bank of America. (*Id.* at 2). For reasons that are not entirely clear from the record, Fortrend requested that the loan amount be increased from $195 to $215 million. (Gov't Ex. 92, Doc. 23). Fortrend also requested that the pledge of the membership interests of K–Pipe Holdings, L.P. be removed. (*Id.*).

On November 4, 1999, but dated "as of November 8, 1999," K–Pipe executed a Promissory Note to pay Rabobank up to $195 million on November 28, 1999, plus interest, as well as a Security and Assignment Agreement. (Gov't Exs. 148 and 149, Doc. 23). The $195 million, to be deposited into K–Pipe's account at Rabobank on November 8, 1999, was conditioned on, *inter alia*, (i) K–Pipe executing and delivering the Security and Assign-

---

**2.** Although Midcoast agreed to pay $15 million, it escrowed only $14 million, which subjected K–Pipe to the $1 million risk should the closings be delayed. When asked about this discrepancy, Gary Wilson ("Wilson") from PWC testified that K–Pipe's contractual risk would be a "favorable fact" should the Government challenge K–Pipe's participation. (Wilcox Dep., dated Feb. 19, 2007, at 146–47, Doc. 23).

**3.** Indeed, in November 2004, Langley filed suit against Fortrend, K–Pipe, Midcoast, and others in the United States District Court for the District of Kansas, *Langley v. Fortrend Int'l, L.L.C., et al.*, Cause No. 04–2546–JWL, after the Government challenged the Bishop Stock sale. (*See* Kaitson Aff. Ex. 2, Doc. 26).

ment Agreement; (ii) K–Pipe, Langley, Midcoast, and Rabobank entering into an escrow agreement (the "Escrow Agreement");[4] (iii) Rabobank, as escrow agent, receiving the escrow amount equal to at least the principal ($195 million) plus all interest to be due on the advance through maturity, plus $1 million (the "Escrow Amount"); (iv) Rabobank receiving an up-front fee of $750,000; and (v) K–Pipe using the proceeds to purchase the Bishop Stock. (Gov't Ex. 148, Doc. 23). Under the Security and Assignment Agreement, K–Pipe pledged as collateral (i) the Escrow Agreement and the Escrow Amount; (ii) all of its accounts with Rabobank; (iii) all other accounts; (iv) all personal property; and (v) any proceeds of any of the collateral. (Gov't Ex. 149, Doc. 23). The Escrow Agreement was entered into by K–Pipe, as the seller, Midcoast, as the buyer, Rabobank, as the escrow agent, and Bank of America, as the lender. (Gov't Ex. 1–6, Doc. 23). Under the Escrow Agreement, Bank of America agreed to fund $198.1 million into an escrow account set up with Rabobank ("Rabobank Escrow Account # 18359"). (Id.). Thus, the $198.1 million loan acted as security for K–Pipe's loan from Rabobank for the purchase of the Bishop Stock.

On November 8, 1999, the stock purchase transaction closed. As noted above, Bishop changed its name to K–Pipe Group, Inc. and merged with K–Pipe Merger, with K–Pipe Group, Inc. as the surviving entity. K–Pipe Group requested, in writing, a drawdown of $123,345,000 under the Promissory Note to be credited into its Rabobank account ("K–Pipe Group Rabobank # 18313") and authorized Rabobank to debit its up-front fee of $750,000 from the account. (Stern Aff. Ex. 35 at 1160, Doc. 25). K–Pipe Group then authorized the wire transfer of $122,594,852 to Langley under the Stock Purchase Agreement. (Gov't Ex. 1–5 at ENB 317, Doc. 23).

On November 9, 1999, the asset purchase transaction closed. As contemplated by the Escrow Agreement, the following amounts were wired from Rabobank Escrow Account # 18359: (i) $112,695,895 to K–Pipe Group Rabobank # 18313 in consideration for the Bishop Assets; (ii) approximately $79 million directly to Bishop's creditors; and (iii) $6.1 million to Bank of America "for the benefit of Butcher Interest Partnership." (See Gov't Exs. 1–6 and 117, Doc. 23). As noted above, the Butcher Interest was a royalty interest in which Bishop had both an obligation to pay and a right to receive payment. Nevertheless, in exchange for a partnership interest and a distribution of $6.225 million, K–Pipe Group transferred the Butcher Interest to a partnership, The Butcher Interest Partnership, owned 55% by K–Pipe Group and 45% by Midcoast. (Kaitson Aff. ¶ 12, Doc. 26). Midcoast retained the option to purchase K–Pipe Group's interest, and K–Pipe Group retained the option to sell its interest. (Id.). On November 9, Midcoast, on behalf of the Butcher Interest Partnership, transferred $6.225 to K–Pipe Group Rabobank # 18313. Finally, K–Pipe Group received approximately $10 million from a cash reserve account held by a Bishop partnership that was released once Midcoast paid the related Bishop debt. In total, K–Pipe Group received $128,960,431 for the sale of the Bishop Assets. (See Gov't Ex. 116, Doc. 23). From these funds, K–Pipe Group repaid the Rabobank loan and approximately $2 million in fees to advisors involved in the transactions, including $299,750 to LeBoeuf, Lamb, Greene & MacRae, which

4. There is no evidence in the record that Langley entered into a separate escrow agree- ment.

allegedly acted as K–Pipe's counsel on the negotiations. (See id.). The price differential between the stock purchased and the assets sold totaled $6,364,579, which the Government contends was K–Pipe's "fee" for the transaction.

After the transactions, K–Pipe Group retained title to the Bishop Stock, the interest in the Butcher Interest Partnership, $10 million in cash reserves, and certain causes of action against third parties. Because K–Pipe Group had a substantial reportable gain from the sale of the Bishop Assets, K–Pipe Group's parent company, Signal Capital Associates, L.P., allegedly contributed high basis, low fair market value assets to K–Pipe Group in order to offset the gain on the assets.[5] K–Pipe Group filed tax returns for the years 2000, 2001, and 2002, but it engaged in virtually no business activity during that time. K–Pipe Group was ultimately sold to Baguette Holdings, LLC, an entity affiliated with Fortrend, in 2000.

Midcoast took a basis in the Bishop Assets of approximately $192 million, which represents the $122.7 million in cash and $79 million in assumed liabilities that it paid to K–Pipe Group. Midcoast began taking depreciation and amortization deductions in accordance with this basis in 1999.

On January 31, 2000, Midcoast, through KPC, allegedly terminated the Project Development Agreements and paid Langley $10.75 million. (Stern Aff. Ex. 38, Doc. 25). In its 2000 corporate tax return, Midcoast deducted this payment "because it was made to terminate a contractual obligation." (Jordan Aff. ¶ 5, Doc. 27).

On November 10, 2000, Midcoast paid K–Pipe Group $244,750 for K–Pipe Group's interest in the Butcher Interest Partnership. Midcoast, through a subsidiary, then terminated the Butcher Interest, effective January 1, 2001. (See Termination Agreement of the Butcher Interest, Kaitson Aff. Ex. 1, Doc.26). Midcoast claims that it had an adjusted basis in the Butcher Interest of $5,775,416. (Jordan Aff. ¶ 8, Doc. 27). In its 2001 corporate tax return, Midcoast deducted the alleged loss associated with the termination of the Butcher Interest Partnership in the amount of $5,775,416. (See id.).

Enbridge Energy Company, Inc. ("Enbridge"), the present taxpayer, acquired Midcoast in 2001.

B. *The IRS Audit of Midcoast and the Notice of Deficiency*

In February 2001, the IRS issued Notice 2001–16 designating certain intermediary transaction tax shelters as "listed transactions" that can be challenged by the Government. The notice describes the intermediary transaction as follows:

These transactions generally involve four parties: seller (X) who desires to sell stock of a corporation (T), an intermediary corporation (M), and buyer (Y) who desires to purchase the assets (and not the stock) of T. Pursuant to a plan, the parties undertake the following steps. X purports to sell the stock of T to M. T then purports to sell some or all of its assets to Y. Y claims a basis in the T assets equal to Y's purchase price. Under one version of this transaction, T is included as a member of the affiliated group that includes M, which files a consolidated return, and the group reports losses (or credits) to offset the gain (or tax) resulting from T's sale of assets. In another form of the transaction, M may be an entity that is not subject to tax, and M liquidates T (in a transaction that is not covered by § 337(b)(2) of the Internal Revenue Code or § 1.337(d)–4 of the Income Tax

---

**5.** The IRS subsequently audited K–Pipe Group and disallowed these losses.

Regulations), resulting in no reported gain on M's sale of T's assets.

Depending on the facts of the particular case, the Service may challenge the purported tax results of these transactions on several grounds, including but not limited to one of the following: (1) M is an agent for X, and consequently for tax purposes T has sold assets while T is still owned by X, (2) M is an agent for Y, and consequently for tax purposes Y has purchased the stock of T from X, or (3) the transaction is otherwise properly recharacterized (e.g., to treat X as having sold assets or to treat T as having sold assets while T is still owned by X). Alternatively, the Service may examine M's consolidated group to determine whether it may properly offset losses (or credits) against the gain (or tax) from the sale of assets.

(*See* Notice 2001–16, 2001–1 C.B. 730). PWC brought the notice to Midcoast's attention, but advised that disclosure of the Bishop transaction was unnecessary because it was not the "same or substantially similar" to the transaction described in Notice 2001–16. (*See* Robert Aff. ¶ 3, Doc. 28). According to Midcoast, the IRS subsequently broadened the meaning of "substantially similar" such that it found it found it prudent to disclose the Bishop transaction. (*See* Jordan Aff. ¶ 2, Doc. 27). Enbridge, as the successor in interest to Midcoast, finally disclosed the transaction to the Office of Tax Shelter Analysis of the Internal Revenue Service on January 3, 2003. (*See* Disclosure Statement, Gov't Ex. 62, Doc. 23).

In November 2003, the IRS began its audit of the transaction and examined Midcoast's Forms 1120 for tax years ending December 31, 2000, and May 31, 2001. (*See* Jordan Aff. ¶ 2, Doc. 27). It examined Midcoast's Form 1120 for tax year ending December 31, 1999, to the extent any losses had been carried back from Midcoast's 2000 tax year. (*See id.*).

On September 14, 2004, the IRS issued its Notice of Deficiency to Midcoast, listing deficiencies of $573,470 for 1999 and $3,276,338 for 2000. (*See* Notice of Deficiency, Stern Aff. Ex. 13, Doc. 25). Additionally, the IRS assessed a twenty percent penalty on the 2000 deficiency in the amount of $655,267.60. The IRS explained that Midcoast's "returns had been adjusted to reflect the acquisition of stock in 1999 of The Bishop Group, Ltd., also known as (a/k/a) K–Pipe Group, Inc., rather than the assets of that entity." (*Id.*). The IRS also explained that it would not allow the deductions from the Butcher Interest Partnership because there was no evidence that the Butcher Interest had a basis in the hands of Bishop. Finally, the IRS explained that it would not allow the capitalization of terminating the PDA because the costs were included in the purchase price of the Bishop Stock. (*See id.*).

Midcoast paid the amounts set forth in the Notice of Deficiency under protest. (Stern Aff. Ex. 73, Doc. 25). Midcoast also paid under protest the interest associated with these amounts, $911,641. (Jordan Aff. ¶ 7, Doc. 27). Midcoast then filed a tax refund claim with the IRS. Midcoast claimed that, because it acquired assets, not stock, it was entitled to take total depreciation, alternative minimum tax ("AMT") depreciation, and amortization deductions in the amounts of $23,816,420, $22,686,331, and $1,749414, respectively, for the 2000 tax year. (*Id.* ¶ 5). Midcoast also claimed it was entitled to take total depreciation and amortization deductions on the assets in the amounts of $7,228,853 and $745,973, respectively, for the 2001 tax year. (*Id.* ¶ 8). Additionally, for the 2000 tax year, Midcoast claimed that it was entitled to a $10.75 million deduction for the cancelled PDA and a $182,138 deduction for losses from the Butcher Interest Partnership. (*Id.* ¶ 5). Finally, Midcoast stated in its refund claim that it was enti-

tled to deduct the loss associated with the termination of the Butcher Interest Partnership in the amount of $5,775,416 for the 2001 tax year. (*Id.* ¶ 8).

The IRS denied, in relevant part, Midcoast's refund request for these amounts. (*See* Stern Aff. Ex. 17, Doc. 25).

## C. *The Current Case*

On February 28, 2006, Midcoast[6] filed the current suit against the Government, seeking a refund of the total amount paid, plus interest. It claims that it purchased the Bishop Assets, not the Bishop Stock, and that the Government's characterization otherwise is erroneous.

The court has jurisdiction over this action pursuant to 28 U.S.C. 1346(a)(1) ("The district courts shall have original jurisdiction ... [over] ... [a]ny civil action against the United States for the recovery of any internal-revenue tax alleged to have been erroneously or illegally assessed or collected, or any penalty claimed to have been collected without authority or any sum alleged to have been excessive or in any manner wrongfully collected under the internal-revenue laws[.]").

The parties have each moved for summary judgment. The key issue is whether the substance of the transaction matches its form. The cross motions for summary judgment are now ripe for ruling.

## II. Summary Judgment Standard

A party moving for summary judgment must inform the court of the basis for the motion and identify those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, that show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The substantive law governing the suit identifies the essential elements of the claims at issue and therefore indicates which facts are material. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The initial burden falls on the movant to identify areas essential to the nonmovant's claim in which there is an "absence of a genuine issue of material fact." *Lincoln Gen. Ins. Co. v. Reyna,* 401 F.3d 347, 349 (5th Cir.2005). If the moving party fails to meet its initial burden, the motion must be denied, regardless of the adequacy of any response. *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir.1994) (en banc). Moreover, if the party moving for summary judgment bears the burden of proof on an issue, either as a plaintiff or as a defendant asserting an affirmative defense, then that party must establish that no dispute of material fact exists regarding all of the essential elements of the claim or defense to warrant judgment in his favor. *Fontenot v. Upjohn,* 780 F.2d 1190, 1194 (5th Cir.1986) (the movant with the burden of proof "must establish beyond peradventure all of the essential elements of the claim or defense to warrant judgment in his favor") (emphasis in original).

Once the movant meets its burden, the nonmovant must direct the court's attention to evidence in the record sufficient to establish that there is a genuine issue of material fact for trial. *Celotex,* 477 U.S. at

---

**6.** Enbridge Midcoast Energy Inc., formerly known as Midcoast Energy Resources, Inc., filed the original complaint. (Pl.'s Compl., Doc. 1). On April 20, 2006, Enbridge Energy Company, Inc. and Enbridge Midcoast Energy, L.P., formerly known as Enbridge Midcoast Energy, Inc., formerly known as Midcoast Energy Resources, Inc., filed an amended complaint. (Pls.' Am. Compl., Doc. 10). Plaintiffs are collectively herein referred to as "Midcoast."

323–24, 106 S.Ct. 2548. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Indust. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citing *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)). Instead, the non-moving party must produce evidence upon which a jury could reasonably base a verdict in its favor. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505; *see also DIRECTV Inc. v. Robson,* 420 F.3d 532, 536 (5th Cir.2005). To do so, the nonmovant must "go beyond the pleadings and by [its] own affidavits or by depositions, answers to interrogatories and admissions on file, designate specific facts that show there is a genuine issue for trial." *Webb v. Cardiothoracic Surgery Assoc. of North Texas, P.A.,* 139 F.3d 532, 536 (5th Cir.1998). Unsubstantiated and subjective beliefs and conclusory allegations and opinions of fact are not competent summary judgment evidence. *Morris v. Covan World Wide Moving, Inc.,* 144 F.3d 377, 380 (5th Cir.1998); *Grimes v. Texas Dept. of Mental Health and Mental Retardation,* 102 F.3d 137, 139–40 (5th Cir.1996); *Forsyth v. Barr,* 19 F.3d 1527, 1533 (5th Cir.1994), *cert. denied,* 513 U.S. 871, 115 S.Ct. 195, 130 L.Ed.2d 127 (1994); *Topalian v. Ehrman,* 954 F.2d 1125, 1131 (5th Cir.1992), *cert. denied,* 506 U.S. 825, 113 S.Ct. 82, 121 L.Ed.2d 46 (1992). Nor are pleadings summary judgment evidence. *Wallace v. Tex. Tech Univ.,* 80 F.3d 1042, 1046 (5th Cir. 1996) (citing *Little,* 37 F.3d at 1075). The non-movant cannot discharge his burden by offering vague allegations and legal conclusions. *Salas v. Carpenter,* 980 F.2d 299, 305 (5th Cir.1992); *Lujan v. National Wildlife Fed'n,* 497 U.S. 871, 889, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990). Nor is the court required by Rule 56 to sift through the record in search of evidence to support a party's opposition to summary judgment.

*Ragas v. Tennessee Gas Pipeline Co.,* 136 F.3d 455, 458 (5th Cir.1998) (citing *Skotak v. Tenneco Resins, Inc.,* 953 F.2d 909, 915–16 & n.7 (5th Cir.1992)).

Nevertheless, all reasonable inferences must be drawn in favor of the non-moving party. *Matsushita,* 475 U.S. at 587–88, 106 S.Ct. 1348; *see also Reaves Brokerage Co. v. Sunbelt Fruit & Vegetable Co.,* 336 F.3d 410, 412 (5th Cir.2003). Furthermore, the party opposing a motion for summary judgment does not need to present additional evidence, but may identify genuine issues of fact extant in the summary judgment evidence produced by the moving party. *Isquith v. Middle South Utilities, Inc.,* 847 F.2d 186, 198–200 (5th Cir.1988). The non-moving party may also identify evidentiary documents already in the record that establish specific facts showing the existence of a genuine issue. *Lavespere v. Niagara Mach. & Tool Works, Inc.,* 910 F.2d 167, 178 (5th Cir. 1990). In reviewing evidence favorable to the party opposing a motion for summary judgment, a court should be more lenient in allowing evidence that is admissible, though it may not be in admissible form. *See Lodge Hall Music, Inc. v. Waco Wrangler Club, Inc.,* 831 F.2d 77, 80 (5th Cir. 1987).

■ In a refund suit, the taxpayer has the burden of proving that the IRS's determination is incorrect. *Yoon v. Comm'r,* 135 F.3d 1007, 1012 (5th Cir.1998).

## III. Analysis

### A. *The Substance of the Transaction: Sale of Stock or Sale of Assets?*

It is undisputed that Midcoast wanted to own the Bishop Assets. The Government contends that there were two "direct" routes in which Midcoast could have purchased the Bishop Assets: (1) a direct asset sale, or (2) a stock sale, followed by a

liquidation of Bishop. In a direct asset sale, the purchaser (Midcoast) gets a cost basis in the assets, the corporation (Bishop) is liable for the tax on the gain, and the shareholders (Langley), who receive the asset proceeds, are liable for a gain on their shares. *See* I.R.C. §§ 1001, 331, and 1012. In the stock sale/liquidation scenario, the selling shareholders (Langley) are liable for the tax on any gain in their shares, and, while the liquidation of the target (Bishop) into its acquiring parent corporation (Midcoast) will be tax free, the assets will take their historic or "carry-over" basis. *See* I.R.C. §§ 1001, 332, and 334. For situations in which a buyer cannot directly purchase the assets, like where a seller mandates a stock sale, the Code authorizes certain purchasers to elect to treat the price they paid for the stock as the asset basis. *See* I.R.C. § 338. However, the election effects a deemed sale of the assets, and the corporate level tax on the deemed sale must be paid by the newly acquired target corporation. A section 338 election would, therefore, have provided less value to Midcoast had it chosen that route. Thus, there were definite tax benefits to all the parties involved in using an intermediary to purchase the stock and sell the assets. In particular, Midcoast enjoyed a substantial step up in basis on the Bishop Assets.

■ A key principle in tax law is that the incidence of taxation depends upon the substance of a transaction rather than its form. *See Gregory v. Helvering*, 293 U.S. 465, 469, 55 S.Ct. 266, 79 L.Ed. 596 (1935); *see also Freytag v. Comm'r*, 904 F.2d 1011, 1015 (5th Cir.1990) ("The fundamental premise underlying the Internal Revenue Code is that taxation is based upon a transaction's substance rather than its form. Thus sham transactions are not recognized for tax purposes . . ."). There are numerous iterations of the substance over form doctrine, which include, in relevant part, (1) the conduit theory; (2) the

step transaction doctrine, and (3) the economic substance doctrine. Here, the Government contends that under any one of the substance over form doctrines, the participation of K–Pipe should be disregarded, and Midcoast should be deemed to have purchased the Bishop Stock and to have liquidated Bishop. The court finds that the conduit theory is the most analogous to the facts in this case and applies this substance over form doctrine to affirm the Government's recharacterization of the transaction as one of stock rather than assets.

■ In the conduit theory of the substance over form doctrine, the court may disregard an entity if it is a mere conduit for the real transaction at issue. As the Supreme Court stated in *Comm'r v. Court Holding Co.*, 324 U.S. 331, 65 S.Ct. 707, 89 L.Ed. 981 (1945),

> The tax consequences which arise from gains from a sale of property are not finally to be determined solely by the means employed to transfer legal title. Rather, the transaction must be viewed as a whole, and each step, from the commencement of negotiations to the consummation of the sale, is relevant. A sale by one person cannot be transformed for tax purposes into a sale by another by using the latter as a conduit through which to pass title. To permit the true nature of a transaction to be disguised by mere formalisms, which exist solely to alter tax liabilities, would seriously impair the effective administration of the tax policies of Congress.

*Id.* at 334, 65 S.Ct. 707 (internal citations omitted). The contours of the conduit theory are not well defined. Nevertheless, a close scrutiny of the precedent discussing conduits provides the court with guidance on when and how to apply this theory.

In *Court Holding,* an apartment house was the sole asset of a corporation. *Id.* at

332, 65 S.Ct. 707. The corporation wanted to sell this asset and had reached an oral agreement with a third party purchaser. *Id.* at 333, 65 S.Ct. 707. Before the agreement for the asset sale could be reduced to writing, the corporation's attorney informed the purchaser that the sale could not be consummated because it would result in a sizable income tax on the corporation. *Id.* Rather than consummate the sale, the corporation transferred the apartment house in the form of a liquidating dividend to the corporation's two shareholders. *Id.* The two shareholders, in turn, formally conveyed the asset to a purchaser who had originally negotiated for the purchase of the asset from the corporation. *Id.* The Supreme Court affirmed the Tax Court's conclusion that, under these facts of the entire transaction, the role of the intermediary should be disregarded and the corporation should be deemed as having sold the asset. *Id.* at 334, 65 S.Ct. 707.

The Supreme Court faced a similar situation in *United States v. Cumberland Pub. Serv. Co.*, 338 U.S. 451, 70 S.Ct. 280, 94 L.Ed. 251 (1950). In that case, the shareholders of a closely-held corporation offered to sell all the corporate stock to a local cooperative. *Id.* at 452, 70 S.Ct. 280. The cooperative refused to buy the stock, but countered with an offer to buy certain assets from the corporation. *Id.* The corporation refused, not wanting to pay the heavy capital gains tax from the asset sale transaction. *Id.* The shareholders agreed to acquire the assets as a liquidated dividend and then sell them to the cooperative. *Id.* at 452–53, 70 S.Ct. 280. The cooperative accepted, and the assets were transferred in this manner. *Id.* at 453, 70 S.Ct. 280. The corporations remaining assets were sold, and the corporation dissolved. *Id.* The Tax Court found that the sale was made by the shareholders and not the corporation, concluding that the liquidation and dissolution were genuine transactions

and that at no time did the corporation plan to make the sale itself. *Id.* The Supreme Court accepted the Tax Court's finding of fact that the sale was made by the stockholders rather than the corporation. *Id.* at 455. As the Court noted, "[t]he Government's argument that the shareholders acted as a mere 'conduit' for a sale by respondent corporation must fall before this finding." *Id.*

These Supreme Court cases form the backdrop of the conduit analysis, but neither *Court Holding Co.* nor *Cumberland* deal with the same factual scenario as in this case, i.e., when a corporation sells its stock to an entity, which turns around and sells the assets to a third party. The parties have directed the court's attention to three 5th Circuit cases addressing more analogous factual scenarios: *Davant v. Comm'r*, 366 F.2d 874 (5th Cir.1966); *Blueberry Land Co. v. Comm'r*, 361 F.2d 93 (5th Cir.1966); and *Reef Corp. v. Comm'r*, 368 F.2d 125 (5th Cir.1966). The court addresses each in turn.

In *Davant*, two corporations, Warehouse and Water, were owned by common owners, who wanted to sell the assets of Warehouse to Water and liquidate Warehouse. 366 F.2d at 877–88. The corporations' attorney, Bruce Sr., advised against the direct sale of assets because he believed that the IRS would take the position that the stockholders had received a dividend taxable at ordinary rather than capital rate. *Id.* at 878. Therefore, Bruce Sr. suggested that the stockholders make a sale of their stock to an unrelated third-party, who could, in turn, sell Warehouse's operating assets to Water and liquidate Warehouse without compromising the original stockholders' capital gain treatment. *Id.* The attorney's son, Bruce Jr., who was himself an attorney, agreed to purchase the stock and sell the assets. *Id.* Bruce Sr. contacted the bank holding the corpo-

rations' accounts and secured a loan for Bruce Jr. to purchase Warehouse. *Id.* The stock of Warehouse was the collateral for the loan, and it was understood that Water would then buy the assets Warehouse. *Id.* This money, plus part of the money that Warehouse had in its bank account, would then be used to repay the loan. *Id.* Bruce Jr. received $15,583.30 for his part in the transaction, and the Bank received one day's interest on the loan. *Id.* Bruce Jr. played almost no role in negotiating the transactions or the loan. *See id.* The taxpayers reported capital gain from the sale of the Warehouse stock; the Commissioner disregarded sale of stock to Bruce Jr., arguing that the substance of the transaction was a corporate reorganization with the taxpayers receiving dividends taxable as ordinary income to the extent of earnings and profits. *Id.* at 879. The Tax Court agreed with the Commissioner's characterization, and the Fifth Circuit affirmed. The Fifth Circuit examined and viewed the relevant portions of the Tax Code "as a functional whole" to determine that "[d]istributions of corporate funds to stockholders made with respect their stockholdings must be included in their gross income to the extent that those distributions are made out of the corporation's earnings and profits." *Id.* The 5th Circuit concluded that all the steps by the taxpayer were for the sole purpose of turning what otherwise would be a dividend taxed at the ordinary income rate into a capital gain. *Id.* at 880. It disregarded Bruce Jr.'s participation because "his presence served no legitimate nontaxavoidance business purpose." *Id.* at 881. He was, in the Tax Court's factual determination, "not a purchaser of the stock in any real sense but merely a conduct through which funds passed from Water to Warehouse and from Warehouse to [the stockholder petitioners]." *Id.* at 880.

In *Blueberry Land Co.,* the corporate taxpayers, involved in the real estate de-velopment business, owned certain mortgages and unpaid installment obligations (collectively, "Mortgages"), which they wanted to sell. 361 F.2d at 94–95. A prospective buyer for the assets was First Federal, and the parties began negotiating an asset purchase agreement. *Id.* at 95. First Federal and the taxpayers entered into such an agreement, but the agreement was later rescinded when the taxpayers' attorney advised against a direct asset sale due to the tax consequences. *Id.* at 96. Another attorney, familiar with the nature of the proposed transaction, came forward with an offer to purchase the taxpayer corporations' stock, liquidate the corporations, and sell the assets to First Federal. *Id.* at 97. The attorney formed a shell corporation, Pemrich, to complete the transaction. *Id.* According to plan, Pemrich purchased the stock, dissolved the corporations, and sold the Mortgages to First Federal. *Id.* Pemrich retained as an apparent profit $1,931.71 on the deal. *Id.* at 98. The taxpayer corporations and their stockholders "were not divorced from the transaction," as the stockholders were required to open certain savings accounts at First Federal as collateral for the transferred Mortgages. *Id.* These savings accounts represented 15% of the original sales price of the mortgaged properties. *Id.* In upholding the Tax Court's determination that Pemrich had been a mere conduit for the real obligation flowing between the taxpayer corporations and First Federal, the Fifth Circuit found that Pemrich was entirely dependent on the pre-existing negotiations between the taxpayers and First Federal and that the substance of the transaction was a sale by the taxpayers of their Mortgages, i.e., their assets. *Id.* 101–102. The Court was careful to note, however, that its opinion should not be construed as preventing or discouraging "a real and bona fide sale of stock by stockholders of one corporation to a second

corporation, and liquidation of the first by the acquiring corporation to obtain its assets." *Id.* at 102. The key is the transaction must be substantively real and bona fide. The tension between legitimate and sham transactions is reflected in the Fifth Circuit's following comments in the case:

We have said many times, and we here reiterate, that one may not only lawfully yearn for tax savings, but he may utilize and exploit every available legitimate means of arranging his affairs to achieve this end. Thus Taxpayers and their stockholders were entitled to avail themselves of the sale of stock method of disposing of Taxpayers if they so chose. But the stumbling block here is that First Federal, which throughout this transaction was the only party actually interested in obtaining Taxpayers' mortgages, could not—and hence would not—itself purchase Taxpayers' stock from the stockholders, because of restrictions on the types of investments open to it. This made necessary the use of an intermediary, which would purchase all of Taxpayers' stock, liquidate Taxpayers into it and thereby obtain their assets (principally the mortgages), and then sell the mortgages to First Federal.

This plan certainly presents a legitimate method whereby the stockholders of one corporation can dispose of their stock to a second corporation, which in turn liquidates, and sells the assets of, the acquired corporation. If this actually takes place, a transaction conducted in this way would be upheld and given effect for Federal income tax purposes. But the question here is not whether a plan of this type is valid or invalid. The question rather is whether under the circumstances of this case, the plan was really what it purported to be. Stated another way, the issue is whether in substance the transaction was as formally cast by the parties; and if not, whether the form, or the substance, should control for tax purposes.

We must take guard against oversimplification, for a glib generalization that substance rather than form is determinative of tax consequences not only would be of little assistance in deciding troublesome tax cases, but also would be incorrect. The fact—at least the tax world fact—is that in numerous situations the form by which a transaction is effected does influence and may indeed decisively control the tax consequences. This generalization does, however, reflect the fact that courts will, and do, look beyond the superficial formalities of a transaction to determine the proper tax treatment.

*Id.* at 100–101.

Finally, in *Reef Corp.*, one of the issues to be determined was whether the taxpayer was entitled to a stepped-up basis in assets acquired in a transaction involving an intermediary. *See* 368 F.2d at 127–30. There, two shareholder groups owned the taxpayer corporation, Reef Fields Gasoline Corporation ("Reef Fields"). *Id.* at 128. One group, the Butler group, decided to buy out the other, the Favrot group. *Id.* One plan that was formulated involved the liquidation of Reef Fields, which would sell its operating assets to a new corporation to be formed in exchange for cash and notes. *Id.* The Favrot group would receive cash and notes while the Butler group would receive only notes. *Id.* The Butler group rejected this plan after learning it would have to pay taxes on the gain and would not be receiving the cash to pay the taxes. *Id.* Thus, the parties agreed to and executed a new plan. *Id.* The Butler group formed another corporation, Reef Corporation ("New Reef"), and received all of the common stock of New Reef in exchange for a portion of their stock in Reef Fields. *Id.* On the same day, Reef Fields contract-

ed to sell its properties to New Reef, but before the sale of the properties, and in accordance with a pre-arranged plan, all of the stock of Reef Fields was sold to an intermediary, who was to carry out the sale of the assets of Reef Fields to New Reef with New Reef giving promissory notes to Reef Fields as consideration. *Id.* Reef Fields distributed the promissory notes to the intermediary, an attorney named George Strong ("Strong") with a business connection to the Favrot group, and Strong pledged the notes to Butler group, Favrot group, and New Reef for the stock they sold to him. *Id.* In affirming the Tax Court's decision to disregard the sale of Reef Fields to Strong, the Fifth Circuit stated as follows:

> [Strong] was a mere conduit in a preconceived and prearranged unified plan to redeem the stock of the Favrot group in Reef Fields. His activity was but a step in the plan. He carried out a sales contract already entered into between the corporations. He assumed no risk, incurred no personal liability, paid no expenses and obtained only bare legal title to the stock. There was an insufficient shifting of economic interests to Strong. It is settled that under such circumstances substance must be given effect over form for federal tax purposes. The holding of the Tax Court in this regard was not clearly erroneous.

*Id.* at 130.

■ All of these cases turn on the trial court's particular findings of fact, which requires examining the transaction as a whole to determine whether it is bona fide. Several facts stand out as particularly relevant and include (1) whether there was an agreement between the principals to do a transaction before the intermediary participated; (2) whether the intermediary was an independent actor; (3) whether the intermediary assumed any risk; (4) whether the intermediary was brought into the transaction at the behest of the taxpayer; and (5) whether there was a nontax-avoidance business purpose to the intermediary's participation. Many of these facts are present in this case and weigh in favor of declaring K–Pipe a mere conduit in the transaction.

Although there was not a formal agreement between Langley and Midcoast regarding the stock sale, the evidence reflects that K–Pipe was able to facilitate that agreement by acting as an intermediary. Midcoast goes to great lengths to distance itself from Fortrend and K–Pipe in order to infuse legitimacy into the intermediary transaction. However, the undisputed facts reveal that it was Midcoast's tax advisors, PWC, who brought Fortrend into the picture and helped to structure the Midco transaction. Ultimately, Fortrend's participation was far less fortuitous than Midcoast intimates. Moreover, there is no objective evidence in the record that K–Pipe negotiated the stock sale at all. All of the communications involved Midcoast, and it was at the insistence of Midcoast's tax advisors that certain actions be undertaken, such as the agreement not to liquidate Bishop for two years and the formation of the Butcher Interest Partnership to add "good facts" to the transaction. Additionally, K–Pipe's obligations were almost entirely indemnified by Midcoast through various side agreements and under the Stock and Asset Purchase Agreements. It was Midcoast's loan that acted as security for the $195 million, which K–Pipe borrowed. K–Pipe, having been created for the purposes of this transaction, could not have provided any assets as security. After the transaction, K–Pipe engaged in virtually no business activity and was, in substance, a mere shell. Finally, K–Pipe's sole purpose in participating in the transaction was to allow Midcoast to step up the basis of the Bishop Assets. Under the facts of this case, the court

finds that K–Pipe's role in the transaction should be disregarded.

■ Disregarding K–Pipe leaves the court with the question of what was the real substance of the transaction: a sale of stock or a sale of assets. In *Blueberry Land Co.*, the Fifth Circuit affirmed the Tax Court's determination that a similar transaction was, in substance, a sale of assets. Nevertheless, in that case, the parties had initially agreed to sell and purchase the assets. Here, by contrast, Langley would not entertain a direct asset sale. Thus, the only way in which Midcoast could have obtained the Bishop Assets was to purchase the Bishop Stock and liquidate. Indeed, it negotiated extensively with Langley for this very purpose. The fact that Midcoast and Langley did not ultimately reach a formal agreement as to the stock purchase is not dispositive. Without K–Pipe's participation, Midcoast must be treated as having purchased the Bishop Stock and liquidated. The Government's recharacterization of the sale as such for tax purposes was, therefore, appropriate.

B. *The Butcher Interest*

■ Midcoast makes two claims relevant to the Butcher Interest: first, Midcoast claims that it is entitled to an ordinary loss in the amount of $182,138 arising from its 45 percent share of the losses from the Butcher Interest Partnership in 2000; and, second, Midcoast claims that it is entitled to either a capital loss or an ordinary loss under IRC §§ 162 or 165 in the amount of $5,775,416 relating to the termination of the Butcher Interest Partnership in 2001. The Government argues that Midcoast cannot take any deductions related to the Butcher Interest Partnership because the partnership was a sham.

■ To determine whether the Butcher Interest Partnership was a sham, the court must examine whether entering into the partnership had economic substance. *See Merryman v. Comm'r,* 873 F.2d 879, 881 (5th Cir.1989) ("transactions which have no economic purpose or substance other than the creation of income tax losses or credits are to be disregarded for tax purposes"). The court must examine the objective realities of the transaction in resolving whether economic substance is present. *See id.* "Where ... there is a genuine multiple-party transaction with economic substance which is compelled or encouraged by business or regulatory realities, is imbued with tax independent considerations, and is not shaped solely by tax-avoidance features that have meaningless labels attached, the Government should honor the allocation." *Id.* (quoting *Frank Lyon Co. v. United States,* 435 U.S. 561, 583–84, 98 S.Ct. 1291, 55 L.Ed.2d 550 (1978)). Here, the court finds that K–Pipe and Midcoast entered the Butcher Interest Partnership solely for the purpose of tax avoidance. The Butcher Interest Partnership was a part of a preconceived plan to provide "good facts" to K–Pipe's participation and disguise the true nature of the Midco transaction. The court is not persuaded that the Bishop Interest had any inherent value to Midcoast other than as a means to bolster its tax position. The court finds, therefore, that the Butcher Interest Partnership was a sham and that Midcoast is not entitled to any deductions relating thereto.

C. *The PDA*

Midcoast is claiming that it is entitled to deduct the entire $10.75 million relating to the terminated Project Development Agreement as an ordinary and necessary business expense under I.R.C § 162. The Government contends that the $10.75 million was, like the $3 million, additional consideration paid for the Bishop stock. The court finds that the facts support the Government's position and holds that Midcoast is not entitled to an additional deduction for this amount.

## D. *The I.R.C. § 6662 Penalty*

■ The IRS may impose a twenty percent penalty for, *inter alia,* negligence or disregard of rules or regulations or a substantial understatement of income tax. I.R.C. § 6662(b).[7] Negligence "includes any failure to make a reasonable attempt to comply with the provisions of [the Internal Revenue Code]" or to exercise ordinary and reasonable care in preparing a tax return. *See* I.R.C. § 6662(c); Treas. Reg. § 1.6662–3(b)(1). According to the regulations, "[n]egligence is strongly indicated where . . . a taxpayer fails to make a reasonable attempt to ascertain the correctness of a deduction, credit or exclusion on a return which would seem to a reasonable and prudent person to be 'too good to be true' under the circumstances[.]" Treas. Reg. § 1.6662–3(b)(1) (ii). "Disregard of rules and regulations" includes any careless, reckless, or intentional disregard of the rules and regulations relating to the Internal Revenue Code. *See* I.R.C. § 6662(c); Treas. Reg. § 1.6662–3(b)(2). A "substantial understatement of income tax" occurs, in the context of a corporation taxpayer, if the amount of understatement exceeds greater of (i) 10 percent of the tax required to be shown on the return or (ii) $10,000. I.R.C. § 6662(d)(1)(B). Because it is undisputed that, having recharacterized the Bishop transaction as an acquisition of stock, Midcoast understated its income tax by 10 percent, the court shall begin by discussing the substantial understatement of income tax provision.

Meeting the mathematical element of the substantial understatement of income tax, standing alone, does not carry the day for the Government because certain statutory exceptions may be applicable. *See Klamath Strategic Inv. Fund, LLC v. United States,* 472 F.Supp.2d 885, 900 (E.D.Tex.2007). Under section 6662, the penalty for a substantial understatement of income tax may not be applicable if Midcoast (1) had "substantial authority" to support the deductions at issue or (2) adequately disclosed the relevant facts relating to the deductions and there is a reasonable basis for the tax treatment claimed. *See* I.R.C. § 6662(d)(2) (B). I.R.C. § 6664 provides an additional exception and states,

> No penalty shall be imposed . . . with respect to any portion of an underpayment if it is shown that there was a reasonable cause for such portion and that the taxpayer acted in good faith with respect to such portion.

I.R.C § 6664(c)(1). There are, however, special rules in cases involving tax shelters, which are defined under the Code as "(I) a partnership or other entity, (II) any investment plan or arrangement, or (III) any other plan or arrangement, if a significant purpose of such partnership, entity, plan, or arrangement is the avoidance or evasion of Federal income tax." I.R.C. § 6662(d)(2)(C)(iii). If a tax shelter is involved in a case with a corporate taxpayer, neither the substantial authority or the adequate disclosure/reasonable basis exceptions under section 6662(d)(2)(B) applies. I.R.C. § 6662(d)(2)(C)(ii).[8] Even if a tax shelter is implicated, the corporate taxpayer may still rely on the reasonable cause/good faith exception in section 6664.

---

7. This particular provision was substantively amended in 2004 and 2005. Unless otherwise noted, the court cites to the provision as it existed before the 2004 amendments, which covers the tax years at issue in this case.

8. For non-corporate taxpayers, an understatement of taxes attributable to a tax shelter removes the adequate disclosure/reasonable basis exception, but the substantial authority exception remains applicable if the taxpayer can show that he reasonably believed that the tax treatment claimed was more likely than not the proper treatment. *See* I.R.C. 6662(d)(2)(C)(i) (II).

The court finds that the Midco transaction in this case meets the definition of a tax shelter under the Code. It is clear that Midcoast undertook the intermediary transaction with the sole purpose of inflating its basis in the Bishop Assets to increase deductions for depreciation and amortization. This qualifies as a plan whose significant purpose is the avoidance or evasion of Federal income tax. As such, the substantial authority or the adequate disclosure/reasonable basis exceptions are not applicable in this case.

Assuming, *arguendo*, that the transaction was not a tax shelter, Midcoast has still failed to show that substantial authority existed for its tax position or that it adequately disclosed the relevant facts of the transaction and had a reasonable basis for its tax position. "The substantial authority standard is an objective standard involving an analysis of the law and application of the law to relevant facts. The substantial authority standard is less stringent than the more likely than not standard (the standard that is met when there is a greater than 50–percent likelihood of the position being upheld), but more stringent than the reasonable basis standard." Treas. Reg. § 1.6662–4(d)(2). For substantial authority to exist, "the weight of the authorities supporting the treatment is substantial in relation to the weight of authorities supporting contrary treatment." Treas. Reg. § 1.6662–4(d)(3)(i); see also *Klamath,* 472 F.Supp.2d at 900. Here, the weight of authorities does not support Midcoast's deductions at issue. Indeed, the weight of authorities counseled against the use of an intermediary in this manner. *See* Part III.A, *supra.* These authorities are more persuasive than those on which Midcoast purportedly relied. With respect to the adequate disclosure/reasonable basis exception, it is undisputed that Midcoast did not adequately disclose the relevant facts surrounding the deductions at issue. As such, neither exception under section 6662 applies to immunize Midcoast from the 20 percent penalty assessed by the Government.

 Finally, the court finds that Midcoast cannot avail itself of the reasonable cause/good faith exception under section 6664. The evidence in the record reflects a knowing participation by Midcoast in a scheme to obfuscate the real transaction at issue. While reliance on the tax advice of professionals will typically satisfy the requirements of section 6664, the court finds that Midcoast's reliance on PWC under the facts of this case to be unreasonable.

## IV. Conclusion

Accordingly, and for the reasons explained above, it is hereby

ORDERED that Defendant's motion for summary judgment (Doc. 23) is GRANTED; and, it is further

ORDERED that Plaintiffs' motion for summary judgment (Doc. 24) is DENIED.